Argued and submitted February 5, 2013, reversed January 29, 2014

In the Matter of S. N. R.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

S. N. R.,
*Appellant.*

Curry County Circuit Court
10JV0064;
Petition Number 10JV0064001;
A148495

320 P3d 569

George W. Kelly argued the cause and filed the brief for appellant.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

In this juvenile delinquency matter, youth appeals from the juvenile court's taking of jurisdiction and disposition based on its conclusion that youth committed acts that would have constituted criminally negligent homicide and assault in the third degree if they had been committed by an adult. On appeal, youth raises two assignments of error, one of which we summarily reject. In the remaining assignment of error, youth argues that there was insufficient evidence to support the juvenile court's conclusions. We agree, on *de novo* review, that youth did not consciously disregard a known and substantial risk that she would fall asleep while driving herself home after school and that the evidence is insufficient to establish that youth's actions were a gross deviation from the standard of care a reasonable person would observe in the situation. Therefore, we reverse.

For the reasons explained below, 260 Or App at 733-35, we exercise our discretion to review this case *de novo*. Although we state the background facts consistently with the juvenile court's express and implied findings that were supported by the uncontroverted evidence, as explained below, we make findings anew on the record with respect to a certain statement that youth made to a state trooper following the accident and with the respect to the inferences that can be reasonably drawn from the corrected statement.

On September 15, 2010, youth drove a friend home to Gold Beach, Oregon, after school. Youth then proceeded to drive to her home in Brookings, Oregon. The accident occurred at approximately 5:00 p.m., and the conditions were dry and clear. Youth was traveling the speed limit of 55 miles per hour in the southbound lane of Highway 101. At about milepost 341, youth's vehicle crossed into the northbound lane and struck a motorcyclist. The crash threw the rider from his motorcycle and into a roadside sign post, killing him. Youth's vehicle continued to cross the northbound lane, leaving skid marks in the road, and came to rest at the side of the highway after hitting a tree.

Following the crash, youth was hysterical and repeatedly told witnesses at the scene that "I'm so tired. I

just fell asleep. I was going to pull over." She told Senior Trooper Wehner at the scene that she was tired, that she believed she had fallen asleep, and that she had struck the motorcycle and then the tree.

Wehner also recorded an interview with youth at the hospital. The recording of youth's statement was played to the juvenile court and admitted as an exhibit in the proceedings. A transcript of the recorded statement was also admitted as an exhibit. The relevant portions of the recorded interview are as follows:

"[YOUTH]:   I started getting tired and I was so—

"OFFICER:   Okay

"[YOUTH]:   Um, and I knew because I do get tired when I sleep (sic), so I always have to pull over and take naps.

"OFFICER:   Okay.

"[YOUTH]:   *So I—I knew I shouldn't put it off, so I—I was looking for somewhere to—to sleep. But I couldn't find a turnoff.*

"OFFICER:   Okay. So you couldn't, but you couldn't find one. Is that what—

"[YOUTH]:   Yeah. But—

"OFFICER:   Okay.

"[YOUTH]:   By the time I got tired, I had already passed one of these.

"OFFICER:   Okay.

"[YOUTH]:   I was just gonna go to the next turnoff. I was gonna pull—pull over; but then the next thing I know, I wake up and I was in the tree.

"OFFICER:   Okay. Do you remember hitting him?

"[YOUTH]:   No. I just remember I hit him, and then the next thing I was going through the little trees.

"* * * * *

"OFFICER:   Okay. And when did you—when did you feel that you were tired?

"[YOUTH]: I don't know. Like I just started feeling tired, and then I just was asleep.

"OFFICER: Okay. Were you—did you—I guess what I'm asking is, were you—were you tired all day, or were you just—did you just—did you start—

"[YOUTH]: No. I just started getting tired.

"OFFICER: Okay. When you were leaving Gold Beach or just when you were driving?

"[YOUTH]: No, when I was driving."

The transcriptionist incorrectly transcribed the above emphasized statement made by youth as, "So I—I knew I should have pulled off, so I—I was waiting for somewhere to sleep, but I couldn't (inaudible)." Upon listening to the recording that was played to the juvenile court, however, we find that the transcription error is apparent. As a result, and as explained more fully below, we take *de novo* review to find anew the correct version of youth's statement and the reasonable inference to be drawn from it.

The night before the accident, youth had slept for approximately five hours after staying up late with her boyfriend. During class the day of the accident, youth also fell asleep for about one hour. The state stipulated that youth had not been drinking, had not taken any drugs, and was not using a cell phone at the time of the accident. The state did not present any evidence of how youth was driving before the accident or any additional evidence of youth's level of fatigue during the day, before she started driving, or when she began to feel tired.

The uncontroverted evidence showed that there were seven pull outs on the southbound side of Highway 101 between milepost 330 (south of Gold Beach) and milepost 341 (the accident site). The last safe pull out was 1.8 miles before the accident site, and at the speed limit of 55 miles per hour, it would have taken youth approximately two minutes to travel that distance. The state also presented evidence that there was a dedicated left turn lane that led to a wide spot on the northbound side of the highway. The state's witness estimated that the left turn was one eighth to one quarter of a mile before the accident site. Kenneth Dukek,

Director of Curry County Juvenile Department, who had investigated how many pull outs were available on youth's drive, testified that he only looked for pull outs on the southbound side of the highway because a normal person would not be looking for a pull out on the opposite side of the road.

Youth offered testimony from a human factors expert, Dennis Wylie. Wylie testified that people are not good at recognizing when they are fatigued and that a driver can go from not being aware of tiredness, to being aware of tiredness, to a light state of sleep where the driver is not responding to stimuli, all within 60 seconds. Wylie testified that driver drowsiness is not uncommon and that "the driver is not always aware that the driver is being overcome by fatigue, and by the time they realize it, it could be too late." Wylie also testified that it is very common for people to drive after only five or six hours of sleep.

At the conclusion of the evidence, the juvenile court concluded as follows:

"And I disagree with [youth's defense counsel], and I feel that if it were just the issue of falling asleep at the wheel and—or even drifting off at the wheel and moving over, that would be one thing, but that combined with the fact that you—you did indicate to the two witnesses you were so tired, you indicated to Trooper Wehner that you were tired, you fell asleep, you were waiting for some—You said, 'So I knew—I knew I should have pulled off, so I was waiting for somewhere to sleep, but I couldn't.' You indicated, 'I started getting tired, and I was so—um, I knew because I do get tired when I sleep, so I have to pull over and take naps.'

"Those statements and that understanding and the fact that you're a bright person and knew that you needed to pull over and take naps because you could possibly fall asleep, it's clear to me—and I—I don't—I'm not sure where [youth's counsel] is coming from that there's not any just common negligence or regular negligence—it's clear to me that you were aware of the risk and you consciously disregarded the risk, an unsubstantial [sic] and unjustifiable risk that a particular result will occur and/or that the circumstances exist. That's recklessly. And with that follows the criminal negligence, and I find that the State has proven beyond a reasonable doubt both charges."

Thus, the juvenile court relied on the incorrect statement ascribed to youth in the transcript of her interview by Wehner for the court's crucial factual finding concerning youth's knowledge and disregard of the risk of falling asleep while she was driving.

On appeal, youth challenges the sufficiency of the evidence to find that youth's acts constituted criminally negligent homicide and assault in the third degree. Specifically, youth contends that there was insufficient evidence that (1) youth consciously disregarded the risk that she could fall asleep while driving, (2) the risk was substantial, and (3) youth's acts were a gross deviation from the standard of care of a reasonable driver. The state counters that the evidence was sufficient because it showed that youth was sleep-deprived, that she had a known tendency to get fatigued while driving, that she knew she was so tired that she needed to pull over, and that there was an opportunity to pull over one eighth to one quarter mile before the crash.

Youth also requests that we exercise our discretion to take *de novo* review of this case. ORS 19.415(3)(b). We exercise our discretion to take *de novo* review sparingly and only in exceptional cases. ORAP 5.40(8)(c); *Dept. of Human Services v. N. S.*, 246 Or App 341, 344, 265 P3d 792 (2011). We have in prior cases concluded that a case is exceptional, and deserving of *de novo* review, when a crucial finding supporting the lower court's decision does not comport with the evidence in the record. *Dept. of Human Services v. M. E. (A150359)*, 255 Or App 296, 299, 297 P3d 17 (2013); *Dept. of Human Services v. B. B.*, 248 Or App 715, 718, 274 P3d 242, *adh'd to on recons*, 250 Or App 566, 281 P3d 653 (2012); *Hanscam and Hanscam*, 247 Or App 207, 219, 268 P3d 715 (2011); *see also* ORAP 5.40(8)(d)(ii) (among the items relevant to the court's decision "whether to exercise its discretion to try the cause anew on the record or make one or more factual findings anew on the record" is "[w]hether the trial court's decision comports with its express factual findings or with uncontroverted evidence in the record"). As set out above, the transcription of youth's statement contained a significant error on which the juvenile court relied to support its decision to take jurisdiction. Because the parties had not

called attention to that transcription error in their briefing, we requested supplemental memoranda addressing how that error affects our review of this case, if at all. Both youth and the state agree that part of the transcription of youth's statement relied on by the trial court was inaccurate.

Youth contends that the discrepancy provides a basis, in addition to the bases set out in her opening brief, for us to take *de novo* review because the statement as transcribed "conceivably would allow the inference that youth believed she made a mistake in not pulling off earlier." Youth asserts that the statement as transcribed—"I knew I should have pulled off"—effects an admission by youth because it suggests that she could have and should have pulled off the road but chose not to. The actual statement made by youth—"I knew I shouldn't put it off"—uses the present tense, which, youth argues, does not lend itself to the same inference of admission because it indicates that youth immediately began to look for the first turn off when she became aware of her fatigue. The state asserts that the transcription discrepancies are immaterial because both versions, set in context with youth's immediately prior statement that "I knew because I do get tired when I sleep (sic), so I always have to pull over and take naps," have the same meaning, *i.e.* that "youth was aware of the risk that she would fall asleep at the wheel and knew she should pull over, yet she did not." We conclude that youth has the better argument.

As set out above, the juvenile court expressly relied on two of youth's transcribed statements made to Trooper Wehner to find that youth acted with a conscious disregard of a substantial and unjustifiable risk: (1) youth knows that she gets tired when she drives and needs to pull over and (2) youth "knew she should have pulled off." The first statement, which is uncontroverted, lent itself to the unremarkable inference that youth was aware of the risk posed by driving when sleepy. As youth points out, however, the second statement, as incorrectly transcribed, lent itself to the reasonable and significant inference that youth knew that she was too tired to drive and needed to pull over, but that she had waited to do so. The juvenile court relied on that apparent key admission.

In contrast, the second statement as correctly recorded does not lend itself to that same inference of an adverse admission. As youth states, the use of the present tense in that statement confirms that youth meant that she knew that she should not wait to pull over, so she immediately began looking for a safe place to do so as soon as she was aware of her fatigue. It would be unfair to youth to use the incorrectly transcribed statement against her, when the statement she did make does not lend itself to a similar inference of an adverse admission.

Therefore, we take *de novo* review on a limited basis to find as follows: (1) Youth said in her statement to Wehner, "So, I—I knew I shouldn't put it off, so I—I was looking for somewhere to—to sleep. But I couldn't find a turnoff." (2) That statement indicates that youth knew at that time that she should not put off pulling over and so was looking for a turnoff. We conclude that, in the absence of the inferred adverse admission on which the juvenile court relied to make its finding that youth disregarded a known risk, the remaining evidence in the record, which is uncontroverted, is legally insufficient to support a determination, beyond a reasonable doubt, that youth consciously disregarded a substantial and unjustifiable risk that she would fall asleep while driving and that youth's conduct was a gross deviation from the standard of care of a reasonable driver.

"A person commits the crime of criminally negligent homicide when, with criminal negligence, the person causes the death of another person." ORS 163.145(1). Criminal negligence

> "means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(10). As charged against youth in this case, "[a] person commits the crime of assault in the third degree if the person: * * * [r]ecklessly causes serious physical injury to

another by means of a deadly or dangerous weapon[.]" ORS 163.165(1)(a). Recklessly

> "means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9). Under the circumstances of this case, the difference between the two crimes lies largely with the mental states required to prove them. "The difference between the two mental states is that a criminally negligent defendant grossly deviates from the standard of care of a reasonable person by *failing to be aware of a risk,* whereas a reckless defendant grossly deviates from the standard of care of a reasonable person by *consciously disregarding a known risk." State v. Clark,* 256 Or App 428, 455 n 6, 300 P3d 281 (2013) (emphasis in original). Here, the juvenile court had found that youth's conduct was reckless, which also satisfied the mental state for criminal negligence. ORS 161.115(3) ("If the definition of an offense prescribes criminal negligence as the culpable mental state, it is also established if a person acts intentionally, knowingly or recklessly.").

Although guest passenger cases, which discuss gross negligence, do not provide an exact comparison to criminal negligence or recklessness, those cases do provide guidance on the difference "between conduct that was merely negligent and conduct that demonstrated a more culpable state of mind[.]" *State v. Lewis,* 352 Or 626, 639 n 6, 290 P3d 288 (2012). In examining several guest passenger cases, we have distilled the principle "that mere inadvertence, brief inattention, or error in judgment as to the proper speed does not constitute gross negligence without some basis for inferring that the acts were done with some reckless mental state or a conscious indifference to the safety of others." *Smith v. Barry,* 37 Or App 319, 325, 587 P2d 483 (1978).

Consistently with that distilled principle, the Supreme Court has expressed that, " '[t]o constitute gross negligence in falling asleep while driving there must have been such prior warning of the likelihood of sleep that continuing to drive constitutes reckless disregard of consequences.' " *Smith*

*v. Williams*, 180 Or 626, 638, 178 P2d 710 (1947) (quoting *Boos v. Sauer*, 266 Mich 230, 233, 253 NW 278, 279 (1934)); *see also Fisher v. Huck*, 50 Or App 635, 650, 624 P2d 177, *rev dismissed*, 291 Or 566 (1981) (Richardson, J., dissenting) ("In order to prevail on a theory of gross negligence when a host driver falls asleep the guest passenger must establish that the driver had sufficient prior warning of the likelihood of sleep to reduce the substantial risk of injury, but continued to drive in the face of that risk."). In *Smith v. Williams*, the court determined that the evidence raised a question for the jury of whether the defendant's conduct constituted gross negligence. The evidence showed that at about 4:00 a.m., after being out driving all night, the defendant was traveling over 50 miles per hour on a loose gravel road and "that he became sleepy, knew he was sleepy, but thought he could make it home and continued to drive and did fall asleep." 180 Or at 637.

In the criminal context, we have observed that finding a defendant guilty of criminally negligent homicide requires evidence that the defendant should have been aware of a problem with the defendant's driving, such as swerving, inattention, or near collisions, before the ultimate accident giving rise to the charges. *State v. Brinager*, 96 Or App 160, 162-63, 771 P2d 658, *rev den*, 308 Or 158 (1989). Therefore, we conclude, in accordance with *Smith v. Williams* and our prior cases, that to find a defendant guilty of criminally negligent homicide (or other crime) based upon falling asleep while driving requires some evidence that the defendant had, or should have been aware of, a sufficient prior warning of the likelihood of sleep so that the defendant had the opportunity to reduce the substantial risk of injury.

Here, youth had some prior warning of the likelihood that she could fall asleep; however, that warning was not sufficient to give her time to react and to find a safe place to pull over so as to constitute a greater culpable mental state than ordinary negligence. Although youth had taken a nap during class earlier in the day, she stated that she did not feel tired until she was driving back from Gold Beach just after she had passed a turn out in the road. Youth was aware that she gets tired when she drives and that she has to pull over and take naps. When youth felt tired, youth

stated that she knew she should not put it off so she immediately began looking for a place to pull over and sleep, but the next thing she knew was that the accident had occurred.

The only reasonable inference that can be drawn from youth's uncontroverted statements, as correctly transcribed, and from the evidence concerning the highway, is that she did not feel tired until after she had passed the last pull out on the southbound side of highway 101 before milepost 341. The location of that pull out is 1.8 miles before milepost 341. Based on the speed limit at which youth was traveling, that would have been about two minutes before the accident happened. Thus, youth did not have an opportunity to pull over after she began feeling tired. Youth's testimony indicated that she drew on her experience in making the decision to immediately look for a place to pull over as she safely had done in the past. No evidence was presented that anything about youth's prior experience could have warned her of a risk that, in this instance, she would not have time to make it to the next turn out. *See Clark*, 256 Or App at 436 ("[W]hen determining whether a driver is guilty of a reckless crime, a jury must focus on the driver's decision making, not just his or her driving."). We conclude that the evidence is legally insufficient to find beyond a reasonable doubt that youth consciously disregarded the risk that her tiredness presented once she became aware of it.[1]

The state argues that, even if youth's statements are credited, youth consciously disregarded the risk of falling asleep by failing to use the left hand turn lane to pull into a wide spot on the northbound side of the highway approximately one eighth to one quarter mile before milepost 341. Even if we could find that youth was aware of the availability of the left turn into a northbound wide spot (which we do not decide), we conclude that the evidence does not support the state's contention that youth's failure to use the left hand turn lane was a gross deviation from the reasonable standard of care.

---

[1] In light of youth's apparent admission, it appears that the juvenile court did not find the testimony of youth's expert to be pertinent to its ruling; the court did not mention it when ruling. We note that the expert's testimony confirms that a driver can go from a state of not feeling tired to a state of sleep in as little as one minute and that drivers are not always aware that they are being overcome by fatigue.

The only evidence presented at the jurisdictional hearing was that a reasonable person would not be looking for a pull out on the opposite side of the road from which the person was traveling. And, neither party presented any evidence of where the next safe pull out on the southbound side of the highway was located after the accident site. Given the state's evidence of the frequency of southbound pull outs prior to the accident site (seven pull outs in 11 miles), a reasonable driver could forecast that the next pull out would be located only a few minutes down the road. Thus, the record indicates that a typical driver presented with the same situation as youth would have continued driving for a few minutes longer to find the very next safe pull out on the southbound side of the highway.

As discussed above, only two minutes passed between the time youth became aware of her tiredness and the accident. The expert's testimony confirms that drivers who fail to pull over *immediately* upon realizing they are tired are not for that reason alone deviating from a widely shared, reasonable norm. That testimony conforms to prior case law that requires something more than mere inadvertence or brief inattention for a finding of culpability greater than ordinary negligence, and, in the "falling asleep while driving" context, requires sufficient prior warning of the likelihood of sleep. *Smith*, 180 Or at 638; *Brinager*, 96 Or App at 163. There was no evidence adduced below that youth was or should have been aware of her fatigue sooner. There was no evidence that youth had been driving erratically before the accident or had dozed off previously in her drive, nor any evidence that youth had complained of being tired before leaving Gold Beach. And, as discussed above, youth did not disregard the risk of falling asleep because she immediately began looking for an appropriate place to pull over once she started to feel tired—a decision also informed by her prior experience.

Based on the facts adduced at trial and the reasonable inferences that can be drawn from those facts, we conclude that youth's conduct did not constitute a gross deviation from a reasonable standard of care. Therefore, youth did not act recklessly, and the juvenile court erred in taking jurisdiction of youth based on its conclusion that youth's

acts, if committed by an adult, would have constituted criminally negligent homicide and assault in the third degree.

Reversed.