Submitted October 29, 2015, affirmed February 15, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## NATHAN HOWARD STUART,
*Defendant-Appellant.*

Douglas County Circuit Court
12CR2500FE; A155765

389 P3d 1157

Peter Gartlan, Chief Defender, and Ingrid A. MacFarlane, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Egan, Judge.

EGAN, J.

Defendant appeals a judgment of conviction for manslaughter in the second degree, ORS 163.125, for causing the death of another while driving. He assigns error to the trial court's denial of his motion for judgment of acquittal, contending that the evidence was insufficient to prove that he acted recklessly. The state responds that the evidence is sufficient "to support a reasonable inference that defendant was aware of a substantial and unjustifiable risk that continuing to drive that day would cause the death of another person and that he consciously disregarded that risk." We agree with the state. Accordingly, we affirm.

We state the facts in the light most favorable to the state and review those facts to determine whether a rational trier of fact could have found defendant guilty beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). On the morning of November 17, 2012, at around 9:00 a.m., Seehawer pulled out of her driveway and started to drive on Buckhorn Road. Seehawer noticed that defendant was driving a Jeep Grand Cherokee "very close to the back of [her] truck," and she began to drive faster than usual because she felt "pushed." When she looked back, defendant had "backed off." Soon after, defendant's Jeep was "on [her] tail" a second time but again backed off until she could no longer see defendant in her rearview mirror. Defendant's Jeep was on her tail for a third time as she approached Highway 138.

Seehawer then turned left from Buckhorn Road onto Highway 138 and pulled into the far right lane so that defendant could pass her. Defendant passed Seehawer and continued on Highway 138 in the left lane. At one point, Seehawer observed defendant "drift" into the turn lane and then correct his steering back into the left lane. Defendant entered a "sweeping curve," and Seehawer lost sight of defendant's Jeep, but, when she rounded the curve, she saw defendant's Jeep rolling over.

After driving on Highway 138 for about 1.25 miles, defendant's Jeep had crossed into oncoming traffic and collided with a red Neon driven by Fields. The two cars initially hit each other on their front left corners and along the

drivers' sides. Fields received fatal injuries in the collision and died later that day.

Roseburg Police Officer Rosas responded to the scene of the crash at about 9:30 a.m. Rosas observed that defendant's Jeep was on its right side and waited with defendant until the paramedics arrived. Defendant's hand was bleeding and he told the officer that his feet and an ankle were in pain. Defendant also told Rosas that he hoped that he had not killed anyone.

Paramedics Dahl and Harr arrived and helped defendant out of the Jeep and into an ambulance. At that time, defendant was "alert" and "oriented," and only complained about his leg hurting. Both Dahl and Harr noticed that defendant had "significant scarring" and recent "track marks" on his forearm, which are commonly associated with intravenous drug use. Defendant told Dahl that he was a drug user and that he had "shot up" that morning. Defendant told Harr that he had used methamphetamine "a few days" before the crash and Oxycodone the day before the crash. He also said that he had felt "really sleepy" and believed that he had fallen asleep and had woken up to see a red car in front of him.

At the hospital, defendant was treated for a broken toe and minor injuries. He told the emergency physician who examined him that he had been on a methamphetamine "binge" for "the last couple of days" before the collision, but he denied using methamphetamine right before driving. The physician thought that defendant seemed "odd" and ordered a CT scan of defendant's head to check for any injuries; the scan indicated that defendant did not suffer any head trauma from the crash.

Officer Cordell questioned defendant at the hospital. Defendant told Cordell that he had felt tired when he was driving and that he had been up all night playing video games. Cordell noticed that defendant's eyes were "bloodshot and glassy." Defendant said that he had taken about 45 milligrams of Oxycodone and was "smoking something" the day before the crash. Defendant told Cordell that he used Oxycodone for recreational use and pain management. He also said that he had smoked methamphetamine two days

before the crash but that he did not smoke methamphetamine regularly.

Officer Crouse, who is trained as a Drug Recognition Evaluator, also observed defendant during his initial treatment at the hospital. Crouse saw that defendant's lips were "scabbed over," his pupils were noticeably changing sizes, and he had puncture wounds in his arm. Crouse also noticed that defendant was demonstrating "cyclic behavior"—where he would engage in "normal conversation" and then suddenly fall asleep or mutter incoherently.

At around 12:30 p.m., Rosas was directed to go to the hospital to take defendant into custody. Before leaving the hospital, Rosas searched defendant's pants and found a small silver measuring spoon that looked burned on the bottom and that later tested positive for Oxycodone. Defendant told Rosas that he used the spoon for drugs. After transporting defendant to jail, Rosas gave defendant a blood-alcohol test, which was negative.

While in custody, defendant told an officer that he had stayed up for 48 hours but had gotten a few hours of sleep—about three hours—on the morning of the collision. Defendant admitted that, when he was driving on Highway 138, he felt tired and felt like he had closed his eyes. He also remembered that he had last used Oxycodone around 1:00 a.m. or 2:00 a.m. on the morning of the crash. Defendant's blood and urine were tested for controlled substances; his blood tested negative for alcohol and his urine tested positive for methamphetamine, marijuana, Oxycodone, and methadone.

Defendant was charged by indictment with criminally negligent homicide, ORS 163.145, manslaughter in the second degree, ORS 163.125, and driving under the influence of intoxicants, ORS 813.010. He waived his right to a jury trial. At trial, the state called Robert Hara as an expert witness. Hara testified that, based on the level of methamphetamine found in defendant's system, he was likely in the "crash" phase of methamphetamine use. According to Hara, during the crash phase, it is common for a person to be "inattentive" and suddenly "nod off" and to be "up and down, trying to be here but so tired from not having

slept." Hara also testified that Oxycodone generally leaves the bloodstream within 10 hours of use. Defendant's expert, Dr. Robert Julien, also acknowledged that he believed that defendant was coming down from a methamphetamine high and did not have enough amphetamine in his system to keep him awake.

At the close of the evidence, defendant moved for a judgment of acquittal of manslaughter in the second degree. The trial court denied the motion, and convicted defendant of all three charges. The count of negligent homicide merged with the count of manslaughter in the second degree.

On appeal, defendant argues that the trial court erred in denying his motion for judgment of acquittal because the state failed to prove that he had acted recklessly. For the reasons that follow, we conclude that the trial court did not err.

We begin with the relevant statutes. "A person commits criminal homicide if, without justification or excuse, the person intentionally, knowingly, recklessly or with criminal negligence causes the death of another human being." ORS 163.005(1). ORS 163.125(1)(a) provides, as relevant, that "[c]riminal homicide constitutes manslaughter in the second degree when," among other things, "[i]t is committed recklessly[.]" Recklessly, in turn,

> "means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9).

Because the culpable mental state of recklessness "requires that defendant be aware of the risk, our inquiry must focus on defendant's actual perceptions at the time of the crash." *State v. Schlender*, 199 Or App 253, 258, 110 P3d 653, *rev den*, 339 Or 230 (2005). Whether a factfinder could find that defendant was "aware of and consciously disregard[ed]" the risk posed by his conduct is "subjective and will rarely be susceptible to direct proof; it often must be

inferred (or not) from objective facts." *Morehouse v. Haynes*, 350 Or 318, 328, 253 P3d 1068 (2011); *see also Schlender*, 199 Or App at 257-58 ("A factfinder may infer from circumstantial evidence that a defendant was aware of a substantial risk, so long as that inference reasonably flows from the predicate facts.").

Here, there is no doubt that defendant's conduct caused the death of another human being. Additionally, defendant does not contest that his conduct constituted a gross deviation of the standard of care that a reasonable person would observe in the situation. Therefore, the only issue is whether there is evidence in the record from which a rational factfinder could infer that defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk" that his conduct would cause someone's death."

Defendant argues that the facts in this case are similar to the facts of *State v. S. N. R.*, 260 Or App 728, 738, 320 P3d 569 (2014).[1] In *S. N. R.*, the youth was driving home after school when she fell asleep, crossed lanes into oncoming traffic, and struck a motorcyclist, killing him. *Id.* at 729. The youth had slept for about five hours the night before the accident and fell asleep in class for about one hour earlier that day. *Id.* at 731. The youth admitted that, when she was driving home, she realized that she was tired and had intended to turn off the road to take a nap at the first available opportunity, but that she fell asleep before she could find a place to pull off the road. *Id.* at 730. On appeal, the youth challenged the sufficiency of the evidence to support a finding that her acts constituted criminally negligent homicide. *Id.* at 733. We concluded that the evidence was "insufficient to support a determination, beyond a reasonable doubt, that [the] youth consciously disregarded a substantial and unjustifiable risk that she would fall asleep while driving and that [the] youth's conduct was a gross deviation from the standard of care of a reasonable driver." *Id.* at 735. Significantly, we reasoned that the "youth did not have an opportunity to pull over until after she began feeling tired"

---

[1] We exercised our discretion to review that case *de novo* on a limited basis because "the transcription of [the] youth's statement contained a significant error on which the juvenile court relied to support its decision to take jurisdiction." *S. N. R.*, 260 Or App at 733.

because there was no direct evidence "adduced below that [the] youth was or should have been aware of her fatigue sooner." *Id.* at 738-39. We also considered that

> "[t]here was no evidence that [the] youth had been driving erratically before the accident or had dozed off previously in her drive, nor any evidence that [the] youth had complained of being tired before leaving Gold Beach. And, as discussed above, [the] youth did not disregard the risk of falling asleep because she immediately began looking for an appropriate place to pull over once she started to feel tired—a decision also informed by her prior experience."

*Id.* at 739.

Defendant contends that the facts of this case are similar to *S. N. R.* because "there was no direct evidence of defendant's awareness of the substantial risk that his conduct presented." Specifically, defendant argues that there was not enough time "to react to his consciousness of fatigue before he fell asleep" and that "there is also no evidence that defendant acted in disregard for whatever risk he was aware of." We disagree.

Here, there was ample circumstantial evidence adduced below to support a finding that defendant was aware of and consciously disregarded his fatigue. Defendant had been driving erratically before the crash. Seehawer observed defendant tailgate her three times on Buckhorn Road. She also observed defendant drift into the turn lane and correct his steering back into his lane on Highway 138. At the hospital, defendant admitted that he had felt tired when he was driving and that he had been up "all night" playing video games. And, when defendant was in custody, he said that he had been up for 48 hours but had gotten about three hours of sleep the morning of the crash. Defendant told the paramedics that he had felt "really sleepy" and believed he had fallen asleep and woken up to see a red car in front of him. Thus, based on Seehawer's observations and defendant's admissions, a rational factfinder could infer that defendant knew that he was having trouble staying awake well before the crash. In addition, because defendant was driving on roads where other cars were being driven—Buckhorn Road and Highway 138—it follows that a factfinder could also infer

that defendant was aware of and disregarded the risk of death of another person.

Compellingly, there was also evidence that defendant had taken drugs leading up to the crash. Defendant admitted that he had been on a methamphetamine "binge" for several days prior to the crash, had taken about 45 milligrams of Oxycodone the day before the crash, and was "smoking something." At one point, defendant remembered that he used Oxycodone at around 1:00 a.m. or 2:00 a.m. on the morning of the accident. Defendant's urine tested positive for methamphetamine, marijuana, Oxycodone, and methadone. At trial, two expert witnesses testified that, based on the level of methamphetamine found in his system, defendant was likely in the "crash" phase of methamphetamine use where it is common to be "inattentive" and suddenly "nod off." Thus, it is reasonable for a factfinder to infer from the amount of drugs defendant had taken in the days leading up to the crash, that he was aware of the effects of those drugs and that, by driving in that state, defendant was aware of and disregarded the risk that his conduct would cause the death of another person.

Based on the facts adduced at trial and the reasonable inferences that can be drawn from those facts, we conclude that there was legally sufficient evidence for a factfinder to have found that defendant was aware of and consciously disregarded a substantial and unjustifiable risk that his conduct would cause the death of another human being. Therefore, the evidence was sufficient to prove that defendant acted recklessly, and the trial court did not err in denying defendant's motion for judgment of acquittal.

Affirmed.