Argued and submitted December 11, 2012, affirmed April 2, petition for review denied August 7, 2014 (355 Or 879)

Carrell F. BRADLEY,
Trustee of the Carrell F. Bradley Trust,
created September 16, 1992,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
by and through its Department of Forestry,
by and through its State Forester,
*Defendant-Respondent.*

Clatsop County Circuit Court
092063; A144951

324 P3d 504

Larry A. Brisbee argued the cause for appellant. On the briefs was Michael T. Stone.

Stephanie L. Striffler, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Wollheim, Presiding Judge, and Nakamoto, Judge, and Schuman, Senior Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Plaintiffs[1] filed a petition for a way of necessity to acquire road access to their landlocked property over state land owned by the Oregon Department of Forestry (ODF) near the coast in Clatsop County. A plaintiff who seeks a way of necessity over state-owned land cannot receive road access unless the state grants permission for the way of necessity under ORS 376.185. ORS 376.180(11). In turn, ORS 376.185 provides that the state "shall not unreasonably withhold" the required consent for a way of necessity. ODF denied plaintiffs its consent due to its concerns that the access road would harm the nesting habitat of the marbled murrelet, a sea bird that is protected under state and federal statutes concerning endangered species. Plaintiffs argued that the proposed road would not harm nesting habitat and that ODF unreasonably withheld its consent. The circuit court determined that ODF's consent was not unreasonably withheld and entered a judgment denying the way of necessity. In a supplemental judgment, the circuit court awarded ODF its attorney fees and costs in the amount of $45,698.12. Plaintiffs challenge both judgments on appeal. For the following reasons, we affirm.

## I. BACKGROUND

Because it is helpful to an understanding of the dispute, we first provide some background information concerning the protections in effect for the marbled murrelet, general policies for management of state forest lands, and the nature of a way-of-necessity proceeding. We then relate the history of plaintiffs' and the previous owner's attempts to obtain road access through ODF's property and the procedural facts leading to this appeal. We later supplement the facts as we discuss the assignments of error.

### A. *Marbled murrelet protections*

The marbled murrelet (*Brachyramphus marmoratus*) is a sea bird that has declined in population over the past century. In 1992, the marbled murrelet was listed as a

---

[1] Plaintiff Bradley is the trustee of his own trust, the other plaintiff, the Carrell F. Bradley Trust. For ease of reference, we use "plaintiffs" throughout the opinion, even though only the trust is the owner of the property needing road access.

"threatened" species under the federal Endangered Species Act (ESA), 16 USC §§ 1531 - 1544. 57 Fed Reg 45328 (Oct 1, 1992); 50 CFR § 17.11 (1993). The marbled murrelet is also afforded protections by state law, ORS 496.171 to 496.192. Generally, the marbled murrelet nests in old-growth coastal coniferous forests and younger stands with "platforms" along the Oregon coast. To avoid predators, the marbled murrelet seeks nesting sites that provide cover in the middle of the live crown of old-growth trees.

ODF manages its forest lands "to secure the greatest permanent value of those lands to the state[.]" ORS 530.050. Pursuant to that directive, ODF may sell forest products and enter into timber sale contracts. ORS 530.050(2), (3). In addition, ODF may permit the use of its lands for other purposes so long as those uses are not detrimental to the best interest of the state, including protecting fish and wildlife. ORS 530.050(4).

ODF has adopted rules governing the management of state forest lands, *see* OAR chapter 629, division 35, and it defines the phrase "greatest permanent value" in ORS 530.050 to mean "healthy, productive, and sustainable forest ecosystems that over time and across the landscape provide a full range of social, economic, and environmental benefits." OAR 629-035-0020(1). The State Forester is required to actively manage state forest lands to provide sustainable timber harvest and revenues in a way that "[p]rotects, maintains, and enhances native wildlife habitats[.]" OAR 629-035-0020(2), (2)(b). ODF has adopted policies to protect threatened and endangered species, including a set of policies specifically concerning marbled murrelets.

Through its Marbled Murrelet Operational Policies, ODF seeks to "[m]inimize the disruption of [the marbled murrelet's] reproductive activities" and to "maintain habitat suitable for successful nesting" in marbled murrelet occupied sites. Marbled Murrelet Operational Policies 1.1.2.0. In addition, ODF will use reasonable measures to "avoid direct take of marbled murrelets" and to "minimize the risk of any *potential take* incidental to [its] management practices."[2]

---

[2] The term "take" under the ESA means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 USC § 1532(19).

Marbled Murrelet Operational Policies 1.1.1.0 (emphasis added). Pursuant to those policies, ODF establishes Marbled Murrelet Management Areas (MMMAs) in locations that ODF determines are occupied by marbled murrelets.

In 2003, the marbled murrelet was detected in the Hug Point Beach area. In 2005, ODF designated that area as an MMMA, known as the Hug Point Beach MMMA, for the protection of marbled murrelet nesting habitat. Some of ODF's land over which plaintiffs seek a way of necessity lies within the Hug Point Beach MMMA or its "buffer zone." Marbled murrelets have been sighted on ODF's property in the past.

B.  *Statutory way of necessity*

When a landowner has no means of vehicle access to a public road from his or her property, the landowner may petition for a way of necessity across another's property to gain road access pursuant to ORS 376.150 to 376.200. That is the case here. Plaintiffs' property consists of a square parcel with a small "panhandle" at the northwest corner. ODF's land lies south and west of plaintiffs' property. Campbell Group, LLC, a timber company, owns property north and east of plaintiffs' property, and private property lies west of the panhandle of plaintiffs' property. All of the properties are forested, and plaintiffs' property is "landlocked" without access to a public road. To gain road access to their property, plaintiffs filed for a way of necessity, proposing the construction of a road over ODF's land, which ODF opposed.

Unlike an easement, which provides a nonpossessory interest in another's private right of way, "a successful petition for a way of necessity creates public access to landlocked property through a route determined, owned and controlled by the county." *Nice v. Priday,* 149 Or App 667, 673, 945 P2d 559 (1997), *rev den,* 327 Or 82 (1998). To obtain a way of necessity, the landowner petitions the governing body in the county in which the land is located. ORS 376.155(1). Once served with a petition, the county may transfer jurisdiction over the establishment of the proposed way of necessity to the circuit court in that county if the county has adopted an ordinance allowing jurisdiction. ORS 376.200(1). When a circuit court has jurisdiction over

the establishment of the way of necessity, as in this case, the court must appoint an investigator to submit a written report addressing whether the conditions for the way of necessity have been met, recommending possible alternative routes, and making a recommendation for a specific road access location. ORS 376.200(5); ORS 376.160(2).

In a way-of-necessity proceeding, the petitioner or plaintiff has the burden to show, by a preponderance of the evidence, that the 12 conditions for establishing a way of necessity enumerated in ORS 376.180 have been met. *Tyska v. Prest*, 163 Or App 219, 224, 988 P2d 392 (1999) (citing *Witten v. Murphy*, 71 Or App 511, 516, 692 P2d 715 (1984), *rev den*, 298 Or 773 (1985)). One of those conditions, ORS 376.180(11), is at the heart of the dispute in this case. That provision provides as follows:

> "A way of necessity established under ORS 376.150 to 376.200 shall:
>
> "* * * * *
>
> "(11)  Not be established over land owned by the state or a political subdivision of the state unless permission is granted for the way of necessity under ORS 376.185[.]"

In addition, the court must direct the plaintiff to pay reasonable attorney fees and costs incurred by each landowner whose land was subject to the action for the way of necessity. ORS 376.175(2)(e). If the court grants the way of necessity, it must also direct the plaintiff to pay the "amount of compensation due to any owner of land across which" the way of necessity has been established. ORS 376.175(2)(f).

C.  *Requests for easements across ODF's property denied*

Plaintiffs acquired their property from Nordgren, who offered his property to plaintiffs as security for a loan. In 2007, when Nordgren could not pay back his loan, plaintiffs accepted conveyance of the property. At the time of the conveyance, plaintiffs were aware that there had been litigation involving the property but did not know the extent of the property's road access problem. The original plat for the property shows seven different platted roads that connect to the property, but those roads cross deep valleys or steep ridges, which makes access impractical, if not impossible.

The nearest public access or roadway to plaintiffs' property is Shannon Lane, which connects to Highway 101. The Hug Point Beach MMMA on ODF's property lies west of plaintiffs' property and separates plaintiffs' property from Shannon Lane. The MMMA's buffer zone lies directly south of plaintiffs' property.

Nordgren and plaintiffs variously approached ODF and made three different requests for an easement over ODF's property before plaintiffs sought a way of necessity, but ODF denied all of them due to concerns about, among other things, the negative impact to the marbled murrelet habitat. Before Nordgren conveyed the property to plaintiffs, he made two separate requests for an easement. First, in 2004, Nordgren requested an easement that started on Shannon Lane and then went east toward the western border of his property, following a logging road on ODF's property that was not in use. After ODF's professional staff reviewed the request and recommended denial based on concerns about the marbled murrelet habitat, ODF denied Nordgren's 2004 easement request.

In 2005, Nordgren made a second easement request to ODF, but this time he proposed that the access road would start on Shannon Lane and would dip down and run through the Hug Point Beach MMMA's buffer zone, rather than through the MMMA, on ODF's property and then curve up to meet the southern border of his property. In part, ODF denied the request based on biologists' concerns that the proposed easement would cause unacceptable disturbances to marbled murrelet habitat because ODF would not have control over the amount of vehicle traffic over the proposed road.

After they acquired the property from Nordgren, plaintiffs decided to build a residence on the property, and they, too, explored access options. In 2008, plaintiffs met with Bangs, ODF's Natural Resource Specialist, and proposed an easement that would be located in the Hug Point Beach MMMA and would cross ODF's property along the historic logging road that would connect to Shannon Lane. Bangs explained to plaintiffs that their easement request was identical to Nordgren's 2004 easement request, which

had been denied, and suggested that they consider proposing a different route.

Later that year, plaintiffs formally requested an easement for a road that would start on Shannon Lane and would go down along portions of an existing road and then go through the MMMA buffer zone and would meet the southern border of plaintiffs' property. That request was "nearly identical" to Nordgren's 2005 easement request with the exception that plaintiffs offered to provide ODF with the exclusive right to manage the timber on their property. In response to plaintiffs' request, Bangs reviewed information from Nordgren's 2005 easement request through the MMMA buffer zone, and he later sought input from Smith, ODF's Northwest Oregon Area Biologist who had also reviewed Nordgren's two easement requests. Smith concluded that reopening the road and allowing additional construction would cause a risk to the marbled murrelet. Ultimately, Bangs concluded that ODF's previous concerns as to Nordgren's 2005 request remained valid for plaintiffs' 2008 easement request. Assistant District Forester Zilli, who had reviewed Nordgren's 2004 easement request, reviewed plaintiffs' 2008 request and recommended that it be denied because the road would not contribute to the "greatest permanent value" to the state forest.

As relevant to this appeal, in his October 2008 letter, District Forester Savage, on behalf of ODF, stated that plaintiffs' easement request was denied because ODF had concluded that plaintiffs' "alternate location has the potential to negatively impact marbled murrelet habitat." ODF asserted that plaintiffs' proposed road would "require the removal of a large majority of the buffer and create a hard edge close to suitable nesting habitat." ODF noted that it had consulted with the Oregon Department of Fish and Wildlife (ODFW) and the United States Fish and Wildlife Service (FWS), and explained that, in ODFW's opinion, the proposed road "would make the adjacent suitable nesting habitat susceptible to windthrow"[3] and was "likely to lead to an increase in the corvid (jays and crows) population[,]"

---

[3] "Windthrow" refers to the uprooting and overthrow of trees as a result of wind.

making marbled murrelet nesting habitat more susceptible to predation. Although ODF denied plaintiffs' easement request, it was willing to offer them a temporary road-use permit across ODF's land, but only for forest management purposes.

D. *The petition for a way of necessity*

Shortly thereafter, in February 2009, plaintiffs petitioned the Clatsop County Board of Commissions (board) to establish a way of necessity pursuant to ORS 376.150 to 376.200. The board transferred jurisdiction to the Clatsop County Circuit Court pursuant to ORS 376.200 and Clatsop County Ordinance No. 08-01. After the court had jurisdiction, plaintiffs hired (and the circuit court later appointed) AKS Engineering & Forestry, LLC (AKS Engineering) to evaluate their proposed access route and alternative access routes.

The AKS Engineering report, which Hurley, an engineer at AKS Engineering, prepared, proposed six alternative routes and ultimately concluded that Alternative 1 was the most reasonable. Alternative 1 was a proposed route that would require "approximately 750 feet of road improvements/construction between [plaintiffs'] property and the Shannon Lane [right of way] * * *. In addition, a culvert [would] need to be installed where the road crosses Red Rock Creek." Alternative 1 was similar to Nordgren's 2004 easement request to ODF and went from Shannon Lane east to the western border of plaintiffs' property, but in a different area than plaintiffs' 2008 easement request. In the report for Alternative 1, Hurley assumed a road width of 16 feet, with a cleared width of 20 feet, and a permanent easement of 25 feet. He later testified that to construct the proposed road, a cleared width of 30 to 50 feet would be required. Plaintiffs later proposed Alternative 1 for the way of necessity in an amended complaint.

In September 2009, Nelson, plaintiffs' wildlife biologist expert, met with four FWS staff members and Smith for a site visit. During the site visit, the experts and FWS staff members hiked up the historic logging road to plaintiffs' property and then hiked over to ODF's property. Nelson believed that the road would be 12 to 15 feet wide for a

"single car road" and concluded that the marbled murrelets would "not be disturbed or impacted by the improvement of the [proposed] road." Nelson determined that the trees that would be removed for the construction of the road would not open up the canopy and, thus, would not increase the number of predators to the area.

Before they petitioned for a way of necessity, plaintiffs filed an application with FWS for an incidental take permit, which, if approved, would allow them to construct and maintain the proposed road in a manner that might incidentally harm or take the marbled murrelet. Before trial, in November 2009, FWS responded to plaintiffs' incidental take permit request and stated that an incidental take permit was unnecessary because the effect of plaintiffs' proposed road was "not likely to rise to the level of a take [of murrelets]." Notably, before plaintiffs applied for an incidental take permit, Nordgren had submitted a letter to FWS, inquiring about the effects of his proposed road access (in the same area as plaintiffs' proposed road) to the marbled murrelet, and FWS stated that his proposed road through marbled murrelet nesting habitat "could likely result in unauthorized 'take' of a listed species."

In preparation for the way-of-necessity proceeding, Bangs, Smith, Biederbeck, an ODFW wildlife biologist, Savage, and Zilli visited the site. During the site visit, Smith observed potential marbled murrelet habitat trees near the proposed road and was concerned that the road could disturb marbled murrelets in that area. Biederbeck expressed a similar concern with respect to marbled murrelet habitat, stating that he believed that there was a potential risk of losing marbled murrelet habitat trees if the proposed road was constructed 30 feet or wider. Both biologists stated that they were concerned about the increased risk of windthrow due to the proposed road clearing.

At the proceeding, Bangs testified that if he had to make a recommendation with regard to the proposed way of necessity—Alternative 1—he would recommend that ODF deny consent. He based that recommendation on the following facts: "[ODF] originally denied Mr. Nordgren's requests and [plaintiffs' request] *** through this Alternative" and

the proposed road "doesn't contribute to the greatest permanent value and resource management plans [and] transportation plans[.]" Savage also testified that, on behalf of ODF, he would deny consent because there would be "too many adverse impacts" from plaintiffs' proposed way of necessity. Savage explained that the proposed road would adversely impact Red Rock Creek, the stream that the proposed road would cross, because, due to the steepness of the road, it would be difficult to control the runoff water into the stream. He also explained that, based on Smith's comments during the site visit, he believed that the proposed road could adversely impact the marbled murrelet habitat.

After taking the matter under advisement, the circuit court issued a letter opinion, determining that ODF's consent was not unreasonably withheld. The circuit court explained that ODF's concern about damage to the marbled murrelet habitat was reasonable:

> "[Plaintiffs'] evidence did not convince me that a road could be built which would not cause loss or potential harm to the nesting trees and the goals of the murrelet management policies. Ms. Nelson's statements at the scene and testimony regarding a narrow road are at odds with Mr. Hurley's indication of the requirements which would be needed to construct roads to [plaintiffs'] property. The federal agency has sent mixed signals of what would or would not be a concern in the management area. The ODF biologist has consistently raised concerns about road building through the management area. In this case, I find that concern is reasonable and [plaintiffs'] evidence has not convinced me otherwise."

After the circuit court issued its letter opinion, ODF requested an award of its attorney fees and costs pursuant to ORS 376.175(2)(e) and ORCP 68, and plaintiffs objected to that request. Plaintiffs also filed a motion to reopen and filed an objection to the form of the judgment. The circuit court held a hearing and ultimately denied both plaintiffs' motion and objection. It entered a general judgment, dismissing the case with prejudice and awarding ODF costs and reasonable attorney fees. In a supplemental judgment, the circuit court awarded ODF attorney fees and costs in the amount of $45,698.12 pursuant to ORS 376.175(2)(e).

Plaintiffs now challenge the denial of the way of necessity and the award of attorney fees.

## II. ANALYSIS

On appeal, plaintiffs advance eight assignments of error. Their first, second, and third assignments of error relate to the circuit court's decision denying the way of necessity over ODF's property. Plaintiffs first assign as error the circuit court's determination that ODF had not "unreasonably withheld" consent to plaintiffs' proposed way of necessity under ORS 376.185(1). In their second and third assignments, plaintiffs argue that the circuit court erred in failing to give appropriate weight to FWS's November 2009 letter regarding plaintiffs' request for an incidental take permit. Plaintiffs' fourth through eighth assignments of error relate to the attorney-fee provision for establishing a way of necessity, ORS 376.175(2)(e). They assert, among other contentions, that the statute violates state and federal constitutional provisions. We write only to address plaintiffs' first, second, third, and sixth assignments of error; otherwise, we affirm without discussion.[4]

### A. *Plaintiffs' way of necessity*

In their first assignment of error, plaintiffs assert that the circuit court erred in ruling that ODF's consent was "not unreasonably withheld." As previously mentioned, to establish a way of necessity, a plaintiff has the burden to show that all 12 conditions enumerated in ORS 376.180 are met, including that the proposed access road is not "over land owned by the state or a political subdivision of the state unless permission is granted for the way of necessity under ORS 376.185[.]" ORS 376.180(11). Under ORS 376.185(1), "[a] way of necessity *may not be established* * * * across land

---

[4] Plaintiffs request that we exercise our discretion to engage in *de novo* review, ORS 19.415(3)(b), arguing, among other contentions, that the circuit court's findings were not supported by competent evidence and that the circuit court gave too little weight to a statement by FWS that plaintiffs' proposed road "would not create a significant impact to [marbled] murrelets." We disagree with plaintiffs' premises, as discussed later in the opinion, and conclude that this is not an "exceptional" case that warrants *de novo* review. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases.").

owned by the state or a political subdivision of the state *without the consent* of the governing body of the political subdivision or of the appropriate agency of the state" and the state "s*hall not unreasonably withhold consent* required under this subsection." (Emphasis added.)

As a preliminary matter, the parties dispute the legal standard by which to determine whether consent is "unreasonably withheld" under ORS 376.185(1). No Oregon case has addressed that issue. Plaintiffs contend that the standard "is an objective one" and propose this standard: "whether a reasonably prudent person in [ODF's] position would have withheld consent under the circumstances," borrowing from a Washington lease case. *See Ernst Home Center, Inc. v. Sato*, 80 Wash App 473, 484, 910 P2d 486, 492 (1996) (stating that "a lease term preventing a landlord from 'unreasonably' withholding consent requires a reviewing court to examine whether a reasonably prudent person in the landlord's position would have withheld consent to the assignment, not whether the landlord acted arbitrarily"). Plaintiffs also rely on other cases involving private contracts from other jurisdictions for support, including *Worcester-Tatnuck Square CVS, Inc. v. Kaplan*, 33 Mass App Ct 499, 503, 601 NE2d 485, 488 (1992) (stating that a lease term that prevents a landlord from unreasonably withholding consent to a sublease prescribes that the landlord "shall act in accordance with usual standards of reasonableness," which is a question for the factfinder (internal quotation marks omitted)), and *Sun First Nat'l Bank of Orlando v. Grinnell*, 416 So 2d 829, 834 (Fla Dist Ct App), *rev den*, 424 So 2d 761 (Fla 1982) (applying the reasonableness standard to determine whether a mortgagee unreasonably withheld consent to a partial release of the mortgage).

ODF responds that, to the extent that plaintiffs' cited authorities suggest less than a deferential standard, they are inconsistent with the Oregon legislature's intent. Rather, ODF contends, amendments in 1979 to the way-of-necessity statutory scheme support ODF's position that a state agency's decision to withhold consent to a way of necessity is reviewed under a "highly deferential 'arbitrary and capricious' standard" of review. Accordingly, we must

determine the meaning of the term "unreasonably withhold consent" under ORS 376.185(1).

To "pursue the intention of the legislature if possible[,]" ORS 174.020(1)(a), we begin with the text of ORS 376.185. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). Again, the text of ORS 376.185(1) states:

> "A way of necessity may not be established under ORS 376.150 to 376.200 across land owned by the state or a political subdivision of the state without the consent of the governing body of the political subdivision or of the appropriate agency of the state. The governing body of a political subdivision of this state and any agency of the state shall not *unreasonably withhold consent* required under this subsection."

(Emphasis added.)

The legislature did not define the phrase "unreasonably withhold consent." Although that key phrase consists of individual words of "common usage," *see PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (stating that words of common usage should be given their plain, natural, and ordinary meaning), we do not apply the ordinary meaning of the words when the phrase is a term of art with an established meaning in the law. In that event, we give a phrase its well-defined legal meaning. *See Dept. of Transportation v. Stallcup*, 341 Or 93, 99, 138 P3d 9 (2006) ("[W]e give words that have well-defined legal meanings those meanings."); *Tharp v. PSRB*, 338 Or 413, 423, 110 P3d 103 (2005) (terms of art are not given their plain, natural, and ordinary meaning). Plaintiffs may well be correct that the phrase is, in some contexts, such as real property leases, a term of art. We are not convinced, though, that the legislature intended the phrase in this statute to mean what plaintiffs urge, namely, the majority rule on the legal standard imported into a lease by the use of that phrase. *See Ernst Home Center*, 80 Wash App at 484, 910 P2d at 492 (noting that a "majority of jurisdictions" hold that such a lease term requires a court to apply the "reasonably prudent person in the landlord's position" test, but other courts equate unreasonable conduct with arbitrary conduct).

Oregon case law at the time of the 1979 amendments to the way-of-necessity statutes suggested that whether consent was "unreasonably withheld," at least in the landlord-tenant context, depended on whether the reasons for denying consent were arbitrary or capricious. *See Abrahamson v. Brett*, 143 Or 14, 22, 21 P2d 229 (1933) (suggesting that, when there is no reasonableness clause, a landlord may arbitrarily withhold its consent to an assignment or sublet). Of even greater significance, the legislative history of the 1979 amendments is consistent with that standard and specifically addresses the meaning of the legislature's use of the phrase in ORS 376.185(1). *See State Treasurer v. Marsh & McLennan Companies, Inc.*, 353 Or 1, 12, 292 P3d 525 (2012) (recognizing that "the proper analysis of statutory terms can be illuminated by reference to the legislative history of a statute").

The way-of-necessity statutes were revised in 1979 through Senate Bill (SB) 769. Before those revisions, *former* ORS 376.125, *repealed by* Or Laws 1979, ch 862, § 12, did not require a petitioner (or a plaintiff) to acquire the state's consent for a proposed access road over state land. When SB 769 was before the Senate Local Government Committee, Jack Sollis, of the Oregon Department of Transportation, submitted testimony in support of the proposed amendments and pointed out that one of the problems with the pre-1979 version of the statute was that it did not adequately protect lands held by the state for the benefit of the public:

"There is no restriction of the right of an individual to condemn a way of necessity across state lands. I think in the light of today[']s boom in land development that some restrictions should be placed upon the right of a private party to condemn a way of necessity across state lands and in some instances directly [interfering] with the public use for which that land was acquired. Under the existing statutes there [are] absolutely no restrictions and the only requirement is the payment of damages. Unless this problem is dealt with I can [e]nvision the beginning of a circus. A private land owner condemns a way of necessity across a state park to serve a hundred acres of land [that] can be farmed. The state determines that this way of necessity will unduly damage the natural beauty and interfere with the use and operation of the state park so it [in turn]

condemns the private way of necessity that has been condemned across the state park by the individual. After the state has done this the individual turns around [and] condemns another way of necessity across the state park. This procedure could go on ad infinitum. While I agree that there will be situations where it is necessary for a private individual to condemn a way of necessity across state lands I feel that the committee should very seriously consider placing some restrictions on that so that the public use for which the land was acquired is not unduly interfered with."

Testimony, Senate Committee on Local Government, SB 769, Apr 9, 1979, Ex C (statement of Jack Sollis, Oregon Department of Transportation). To avoid the problematic scenario in which the state would have to reacquire a road that was previously established as a way of necessity by bringing a condemnation proceeding, SB 769 proposed that a plaintiff must first obtain the state's consent before establishing a way of necessity. That requirement ultimately became part of ORS 376.185.

Although the amendment authorized the state to deny consent to a proposed way of necessity, the amendment did not allow its authority to be unconstrained and, instead, required that the state shall not "unreasonably withhold" its consent. At the second public hearing on SB 769, before the Senate Committee on Local Government, Isaac Regenstreif, Committee Administrator, asked Sollis about the state's authority to withhold consent to a proposed way of necessity:

"[Regenstreif]: Mr. Sollis, in section 11, that pretty much gives the public body a veto power over a way of necessity. Do they have that authority currently?

"[Sollis]: No, they do not. The reason that I added the language 'such consent shall not be unreasonably withheld' would be to give the petitioner some course of redress in the courts *so that any act that was arbitrary or capricious* since they had no solid reason for denying access they *could have some recourse in the courts.*"

Tape Recording, Senate Committee on Local Government, SB 769, May 15, 1979, Tape 28, Side 1 (statements of Isaac Regenstreif, Committee Administrator, and Jack Sollis, Oregon Department of Transportation) (emphasis added). We conclude from the legislative history that the 1979

amendment of ORS 376.185(1) was intended to establish that the state's consent must not be arbitrarily or capriciously withheld. And, that view of the legislative history is consistent with the text and context of ORS 376.185(1).

As previously mentioned, the "arbitrary and capricious" standard is highly deferential to agency action.

> "The terms 'arbitrary and capricious action,' when used in a matter like the instant one, must mean willful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case. On the other hand, where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion had been reached."

*Jehovah's Witnesses v. Mullen et al*, 214 Or 281, 296, 330 P2d 5 (1958), *cert den*, 359 US 436 (1959); *see also Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 US 29, 43, 103 S Ct 2856, 77 L Ed 2d 443 (1982) ("[A] court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (Internal quotation marks omitted.)).

With that standard in mind, we must decide whether, as a matter of law, the circuit court correctly determined that ODF did not unreasonably withhold its consent—*i.e.*, did not arbitrarily and capriciously withhold its consent. According to plaintiffs, the circuit court erred for two reasons. First, plaintiffs contend that the circuit court's conclusion was based on three factual "findings" that were not supported by competent evidence presented at trial. We reject that argument without discussion. Second, plaintiffs assert that the circuit court erred in concluding that ODF's refusal to consent, because of the potential harm to marbled murrelets, was reasonable. Plaintiffs advance two arguments in support of that contention: (1) there was no evidence "to support the court's conclusion that there was potential loss or harm sufficient to justify the state's denial of [plaintiffs'] request for a way of necessity" and (2) ODF failed to take into consideration that, by denying them road

access, their property would be landlocked. We reject the latter argument.[5]

As for plaintiffs' argument concerning the sufficiency of the evidence, we conclude that the record supports the circuit court's determination. Although plaintiffs presented some evidence that the proposed way of necessity would not cause harm to marbled murrelet habitat, at least if the roadway through the MMMA were only about 12 to 15 feet wide, as plaintiffs' expert assumed, plaintiffs' argument does not account for ODF's evidence. As we stated earlier, a court is not to substitute its judgment for that of the agency, but must determine whether the agency examined relevant data and articulated a satisfactory explanation for its decision. Here, ODF adequately explained the reasons for withholding its consent, and there was evidence in the record to support those reasons.

ODF reasoned that the proposed road would have to be wider than 12 to 15 feet and could result in the potential removal of nesting trees, increased windthrow, and increased predation, all of which would negatively impact the marbled murrelet habitat. Smith testified that, after visiting the site in September and November 2009, he observed several potential marbled murrelet nesting trees that could be disturbed by the construction of the way of necessity. Savage, Bangs, and Biederbeck also saw the proposed roadway and all expressed various concerns as to the impact on quality nesting trees. Thus, there was evidence in the record to support ODF's decision. As a result, we affirm the circuit court's decision that ODF did not unreasonably withhold consent to the way of necessity, because ODF had concerns about the adverse impact of plaintiffs' proposed way of necessity to marbled murrelet habitat and those reasons were supported by evidence in the record.

---

[5] According to plaintiffs, because ODF failed to consider their competing interest, it acted unreasonably when it withheld its consent, citing cases in Oregon and other jurisdictions to demonstrate a public policy against landlocked parcels. *See Braat v. Aylett*, 273 Or 795, 797, 543 P2d 1071 (1975); *see also Town of Selah v. Waldbauer*, 11 Wash App 749, 756, 525 P2d 262, 266 (1974); *Marinclin v. Urling*, 262 F Supp 733, 736 (WD Pa), *aff'd*, 384 F2d 872 (3d Cir 1967). We conclude that, given that the way-of-necessity statute requires that a petitioner's property be landlocked in order for the petitioner to seek a way of necessity over another's property, ORS 376.180(8), (9), ODF need not reconsider whether its decision would result in plaintiffs' property being landlocked.

B.  *Legal significance of the November 2009 FWS letter*

Plaintiffs' second and third assignments of error relate to the circuit court's treatment of the November 2009 letter that FWS sent to plaintiffs about the impacts of the construction of the proposed way of necessity on the marbled murrelet nesting habitat. Plaintiffs essentially contend that the circuit court erred by failing to give conclusive weight to opinions contained in the letter and that the court's legal error substantially affected the outcome of the proceeding. Before we reach the merits of plaintiffs' assignments, which we reject, we pause to provide additional background.

The 2009 letter was the second letter FWS had issued concerning the effect that a road on ODF's property would have on the marbled murrelet. In September 2007, before conveying his property to plaintiffs, Nordgren wrote to FWS to inquire about the effects that road access across the MMMA would have on the marbled murrelet. FWS's responsive letter in 2008 stated that Nordgren's proposed easement "could likely result in [an] unauthorized 'take' of a listed species" pursuant to section 9 of the ESA. The 2008 letter also mentions that, in 2005, an FWS expert, Maurice, visited ODF's property and "confirmed that suitable habitat was present and surveys indicated that murrelets were present and likely nesting at the site." The 2008 letter also explained that private landowners "who wish to conduct activities on their land that might incidentally harm (or 'take') a listed species must first obtain an incidental take permit from the Service."[6] FWS added that to obtain such a permit, "the applicant must develop a Habitat Conservation Plan (HCP), designed to offset any harmful effects the proposed activity might have on the species." The 2008 letter affected the weight that the circuit court gave to FWS's second, 2009 letter.

After they acquired the property, plaintiffs applied for an incidental take permit from FWS. In support, plaintiffs

_____

[6] The ESA assigns the "Secretary" the responsibility for issuing incidental take permits, defining "Secretary" to include the Secretary of the Interior, the Secretary of Commerce, and the Secretary of Agriculture. As relevant in this case, the Secretary of Interior includes FWS and the National Marine Fisheries Service (NMFS), collectively referred to as the Service.

submitted a draft HCP, which explained the potential impacts that were likely to result from the construction of the proposed way of necessity across the MMMA. *See* 16 USC § 1539(a)(2)(A) (stating that no incidental take permit shall be issued unless the applicant submits to the Service a conservation plan). In response, FWS conducted a site visit, along with an ODF staff biologist and plaintiffs' expert, Nelson, to assess the potential impacts to the marbled murrelets.

On November 30, 2009, on the eve of trial, FWS sent plaintiffs a letter that was much more positive than the letter FWS had sent to Nordgren in 2008. In its 2009 letter, FWS concluded that, "[a]fter reviewing * * * the effects of the proposed action on the murrelet, it is the Service's opinion that if the road were to be constructed, gated, and used as proposed it is not likely to result in incidental take of murrelets * * *." FWS stated that its determination was based, in part, on plaintiffs' statements and draft HCP that provided that construction of the proposed road would "involve[] reopening and improvement of [the] historic skid road," "would not involve the removal of any murrelet nesting habitat or trees that buffer nest trees," and "[would be] built outside the murrelet nesting season."

At trial, plaintiffs sought to introduce FWS's 2009 letter into evidence, and ODF objected on hearsay grounds. The court admitted the letter, but later, in its letter opinion, suggested that it "may have been incorrect" in doing so. The circuit court ultimately decided not to give FWS's letter "much weight" for two reasons:

> "First, the author of the letter and people at the scene were not present in court to describe what information they considered regarding the width of the road. The letter references [plaintiffs'] statement that the road would be of 'narrow width' and limited tree removal. Ms. Nelson's belief of the road width and Mr. Hurley's study consider[ed] two different widths. Second, one of the federal biologists who looked at the property in September[] 2009, expressed in 2005 concerns about a road in the same area. In 2008, the federal agency advised Mr. Nordgren his proposal could result in harm to murrelets and violate federal wildlife laws."

After the circuit court entered its judgment, plaintiffs moved to reopen the case, arguing that the court erred in disregarding the legal effect of FWS's 2009 letter. According to plaintiffs, the letter was a "statement of the federal agency" that, under ORS 496.172(4), constituted a "waiver" of any additional state protections of the marbled murrelets for that particular proposed project. The circuit court denied plaintiffs' motion to reopen, concluding that the November 2009 letter was not an incidental take permit or statement.

In their second assignment of error, plaintiffs reprise their argument that FWS's November 2009 letter was a statement by a federal agency, and that under ORS 496.172, the statement was a waiver of any additional state protections. In their third assignment of error, plaintiffs contend that the circuit court erred in not giving the letter "much weight." We address each assignment in turn.

Plaintiffs contend that, by statute, FWS's November 2009 letter operated as a waiver of more restrictive state action by ODF. Plaintiffs rely on ORS 496.172(4), which provides:

> "In carrying out the provisions of the wildlife laws with regard to the management of wildlife that is a threatened species or an endangered species, the State Fish and Wildlife Commission:
>
> "* * * * *
>
> "(4)   By rule, shall establish a system of permits for scientific taking of threatened species and endangered species and shall establish a system of state permits for incidental taking of state-designated threatened species and endangered species not listed by the federal government under such terms and conditions as the commission determines will minimize the impact on the species taken. An incidental taking permit or statement issued by a federal agency for a species listed under the federal Endangered Species Act of 1973 ([PL] 93-205, 16 [USC §] 1531), as amended, shall be recognized by the state as a waiver of any state protection measures or requirements otherwise applicable to the actions allowed under the federal permit."

Plaintiffs also rely on an administrative rule by ODFW that further explains the "waiver" requirement:

"An incidental take permit shall not be issued for any species listed under the federal ESA. An incidental take permit or statement issued by a federal agency shall be considered a waiver of any state protection measures or requirements otherwise applicable to the actions allowed by the federal agency."

OAR 635-100-0170(3). Plaintiffs contend that ORS 496.172, along with OAR 635-100-0170(3), stands for the proposition that any state protections of endangered or threatened species must be "waived" if a federal agency issues an "incidental take permit or statement." In plaintiffs' view, because the marbled murrelet is a threatened species listed under the ESA and FWS issued a "statement" determining that the construction of the proposed road would not rise to the level of a "take," the state, including ODF, is prohibited from imposing any additional protective measures.

ODF, on the other hand, argues that ORS 496.172(4) does not treat *every statement* by a federal agency as a waiver of additional state protections of endangered or threatened species. Instead, ODF contends that the statute is limited to only two federal actions under the ESA: incidental take permits and incidental take statements. And, according to ODF, because the FWS 2009 letter is neither an incidental take permit nor an incidental take statement, ORS 496.172(4)'s waiver requirement is inapplicable.

We agree with ODF's reading of ORS 496.172(4). The statutory language—"incidental taking permit or statement issued by a federal agency"—is phrased in terms of alternatives, and we construe that phrase to mean incidental take permits or incidental take statements issued by a federal agency. Our reading is supported by the context of ORS 496.172. That statute sets out the management duties and responsibilities of the State Fish and Wildlife Commission with respect to endangered and threatened species that are listed pursuant to ORS 496.182. Under ORS 496.172(4), the State Fish and Wildlife Commission is authorized to establish an incidental take permitting system for "state-designated threatened species and endangered species *not listed by the federal government* ***." (Emphasis added.) The exclusion of federally listed species from the state's incidental permitting system is, in part, because the ESA already

sets out its own procedures for the incidental take of federally listed species.

When ORS 496.172 was amended in 1995, Or Laws 1995, ch 590, § 3, the legislature understood that for federally listed species, the ESA sets out two types of "incidental take" exceptions—incidental take permits and incidental take statements—depending on the type of action affecting the listed species. When a private party's action could affect a federally listed species, the ESA authorizes that party to apply for an *incidental take permit*, 16 USC § 1539(a)(1), and the Service "may permit, under such terms and conditions as [it] shall prescribe[,]" any incidental taking, 16 USC § 1539(a)(1)(B). However, when federal agency action is involved (instead of a private party), then the ESA allows that federal agency to engage in a comparatively informal consultation process with the Service to obtain an *incidental take statement*. 16 USC § 1536(b)(4); *Ramsey v. Kantor*, 96 F3d 434, 439 (9th Cir 1996). An incidental take statement establishes, among other things, the amount of authorized taking of the species and specifies the measures to minimize a take. 50 CFR § 402.14(i), (ii). Thus, any taking of a federally listed species by a federal agency or private application that complies with the conditions set forth in either an "incidental take permit" or an "incidental take statement" is permitted under the ESA.

In light of the statutory background of the ESA, we conclude that the legislature's use of the phrase "statement issued by a federal agency" in ORS 496.172(4) does not refer to *any* statement that an agency makes concerning a federally listed species. Rather, the statute refers to an *incidental take statement* issued to a federal agency that authorizes the incidental take of a federally listed species.

Applying ORS 496.172(4) to this case, we conclude that FWS's November 2009 letter is neither an incidental take permit nor an incidental take statement. In its letter, FWS states that "it is the Service's opinion that if the road were to be constructed, gated, and used as proposed it is not likely to result in incidental take of murrelets * * *." However, the FWS letter is not an incidental take permit because it does not allow any incidental taking of marbled

murrelet in response to plaintiffs' draft HCP. It concludes instead that a taking is not likely to occur. Nor is FWS's November 2009 letter an incidental take statement because, as mentioned above, an incidental take statement is issued to *federal agencies* whose actions potentially affect federally listed species. We therefore reject plaintiffs' second assignment of error.

Plaintiffs next assign error to the circuit court's determination that it would not give much weight to FWS's November 2009 letter. We address only one of plaintiffs' arguments and reject the others without discussion.

Plaintiffs contend that, despite the circuit court's concern that FWS's November 2009 letter contained hearsay statements, the letter was admissible under OEC 803(8)(c), an exception to the hearsay rule, and was entitled to significant weight. *See* OEC 803(8)(c)[7]; *see also* 1981 Conference Committee Commentary to OEC 803 Subsection (8) ("This exception is justified by the assumption that a public official will perform the official's duty, and by the unlikelihood that a person will remember details independently of the record."). Plaintiffs assert that, because federal employees cannot be compelled to testify in state court, *see Touhy v. Ragen*, 340 US 462, 71 S Ct 416, 95 L Ed 417 (1951) (holding that a state court cannot enforce a subpoena directed to a federal employee); 43 CFR § 2.281 (stating that employees of the Department of Interior, which includes FWS, are prohibited from testifying in a private action absent specific authorization), statements by federal agencies resulting from an investigation should generally be treated as credible and admissible. In plaintiffs' view, there was no evidence

---

[7] OEC 803(8)(c) provides, in part:

"The following are not excluded by [the hearsay rule], even though the declarant is available as a witness:

"\* \* \* \* \*

"(8) Records, reports, statements or data compilations, in any form, of public offices or agencies, \* \* \* setting forth:

"\* \* \* \* \*

"(c) In civil actions and proceedings \* \* \*, factual findings, resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness[.]"

presented at trial to indicate any untrustworthiness of FWS's statements, and, therefore, the circuit court erred in giving those statements "not much weight."

Our review of the circuit court's admission of FWS's November 2009 letter is limited to determining whether the court committed an error of law regarding the evidence. The circuit court did admit the 2009 letter into evidence, and so plaintiffs' challenge boils down to the amount of weight that the evidence should have been given. The circuit court provided several reasons to question FWS's opinions in the letter, apart from the fact that the opinions it contained were hearsay. The circuit court considered the 2009 letter unreliable because it was unclear what the FWS personnel relied on "regarding the width of the road," and the court observed a contradiction in that "one of the federal biologists who looked at the property" in September 2009, Maurice, had earlier expressed in 2005 "concerns about a road in the same area." We reject the suggestion that an admissible written statement by a federal agency must be given conclusive weight as a matter of law in all circumstances, regardless of legitimate concerns regarding its reliability such as the ones voiced by the circuit court. In addition, unless engaging in *de novo* review, we do not reweigh the evidence or make our own findings of fact. To the extent that plaintiffs seek such an outcome, their third assignment of error fails in that regard as well. Accordingly, the 2009 FWS letter did not require the circuit court to conclude that ODF had no basis to withhold consent to the way of necessity.

C. *Attorney fees*

Having determined that the circuit court did not err in concluding that plaintiffs' petition for a way of necessity should be denied, we turn to plaintiffs' sixth assignment of error, which concerns attorney fees and costs. Plaintiffs contend that ORS 376.175(2)(e) on its face or, in the alternative, as applied, violates Article I, section 10, of the Oregon Constitution. We address each of plaintiffs' arguments separately.

The attorney-fee statute provides that an order granting or denying a way of necessity shall

"[d]irect the *petitioner to pay costs and reasonable attorney fees incurred by each owner of land* whose land was subject to the petitioner's action for a way of necessity under ORS 376.150 to 376.200[.]"

ORS 376.175(2)(e) (emphasis added). Plaintiffs argued to the circuit court that the attorney-fee statute was facially unconstitutional because it required the court to award attorney fees to each landowner, even if that landowner was the "losing party." As a result, plaintiffs asserted that the effect of the attorney-fee statute is to "impose the government's costs, disbursements and attorney fees on the plaintiff[] as a condition of using the court system," which would "chill" a plaintiff's right to bring an action for a way of necessity. The circuit court determined that, because the court denied plaintiffs' request for a way of necessity, as the "losing party," plaintiffs were on notice that they would have to pay the other party's attorney fees and costs. The circuit court entered a supplemental judgment, awarding ODF's attorney fees and costs in the amount of $45,698.12.

Plaintiffs reprise their arguments on appeal, first contending that ORS 376.175(2)(e) on its face violates the Justice Without Purchase Clause of Article I, section 10.[8] A facial challenge "is an assertion that the legislature violated the constitution when it enacted the statute[,]" and such a challenge "can succeed only if there are no circumstances in which the statute could constitutionally be applied." *State v. Johnson*, 238 Or App 672, 675-76, 243 P3d 805 (2010), *rev den*, 351 Or 649 (2012).

Plaintiffs primarily rely on *Allen v. Employment Dept.*, 184 Or App 681, 57 P3d 903 (2002), a case interpreting the Justice Without Purchase Clause, in support of their argument that ORS 376.175(2)(e) is unconstitutional. In that case, the petitioner filed a petition for judicial review by this court and, at the same time, petitioned for a waiver of the appellate filing fee of $140 on the ground that it violated the Justice Without Purchase Clause. *Id.* at 683. We examined the Justice Without Purchase Clause in light of *Priest*

---

[8] The relevant portion of Article I, section 10, provides that "[n]o court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay[.]"

*v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), in which the Supreme Court set forth the methodology for determining the meaning of original constitutional provisions. *Id.* at 684-85. We concluded that

> "the Justice Without Purchase Clause was meant to prohibit (1) the procurement of legal redress through bribery and other forms of improper influence; and (2) the judicial imposition of fees and costs in amounts so onerous as to unreasonably limit access to the courts."

*Id.* at 688. In applying that understanding, we ultimately determined that the appellate filing fee required by ORS 21.010(1) was not unconstitutional because it did not procure any particular result and was not an unreasonable bar to court access:

> "[T]he filing fee is paid at the beginning of the appellate process and without regard to the outcome. Moreover, the last sentence of ORS 21.010(1) provides that the filing fee paid by a prevailing party is recoverable from the losing party, a structure that is inconsistent with the 'purchase' of any particular result. Finally, the fact that the filing fee can be waived or deferred based on a showing of indigence or hardship under ORS 21.605 demonstrates that it is not an unreasonable bar to access to the courts."

*Id.* at 688-89.[9]

Plaintiffs argue that the attorney-fee provision under ORS 376.175(2)(e) unreasonably limits access to the courts by requiring a petitioner or a plaintiff to pay the attorney fees and costs for each landowner whose land was subject to the way-of-necessity petition, regardless of the outcome of the litigation. An award of attorney fees and costs, in plaintiffs' view, could be so exorbitant that it could act as a "litigation penalty" on anyone who petitions for a way of necessity.

---

[9] As both parties acknowledge, other courts have interpreted similar constitutional provisions in a similar manner. *See, e.g., State ex rel. Board of County Com'rs v. Laramore*, 175 Ind 478, 485, 94 NE 761, 763 (1911) (interpreting the "without purchase" provision of The Indiana Constitution to prohibit the costs and fees "so burdensome as to result in a practical denial of justice to a large number of * * * people"); *McHenry v. Humes*, 112 W Va 432, 437, 164 SE 501, 504 (1932) (interpreting the "without purchase" provision of The West Virginia Constitution to prohibit a fee that "would be so oppressive as to cease to be in reality a fee and to become violative of the spirit of the Constitution").

ODF's response focuses on whether it is *reasonable* for the attorney-fee statute to require a petitioner to pay attorney fees and costs to a landowner whose property is affected by the petition. ODF contends that a petition for a way of necessity is not an adversary action; rather, it is an equitable action analogous to eminent domain proceedings. ODF relies on legislative history in support of its contention that ORS 376.175(2)(e) requires a petitioner to pay each landowner's attorney fees and costs because, as in eminent domain proceedings, the affected landowner should be made whole after defending against the petition for a way of necessity by being paid just compensation, which includes attorney fees. In support of the proposed amendments to the 1979 version of the statute, Sollis submitted testimony and explained why a petitioner is required to pay attorney fees and costs to affected landowners:

> "The basis for the allowance of attorney fees, even though there was no statutory provisions for attorney fees * * * is that the court held that this was a proceeding in eminent domain and therefore the landowner was entitled to attorney fees. While this bill does provide for attorney fees the point is that the court considers this an eminent domain taking and * * * the taking by a private individual for public use * * * would require the assessment and tender of just compensation * * *."

Testimony, Senate Committee on Local Government, SB 769, Apr 9, 1979, Ex C (statement of Jack Sollis, Oregon Department of Transportation); *see also Hewitt v. Lane County*, 253 Or 669, 671, 456 P2d 967 (1969) (in a road acquisition proceeding, which is analogous to an inverse condemnation proceeding, "[i]f the landowner is put to the expense of hiring an attorney in order to realize just compensation for his land, he should be entitled, if successful, to attorney fees in addition to the actual money value of the taking"). For that reason, ODF contends that it is not unreasonable to shift the burden to a plaintiff to pay just compensation, even if the plaintiff prevails.

ODF also argues that a petitioner in a way-of-necessity proceeding is not seeking "justice." That is so, according to ODF, because a way-of-necessity proceeding is not an action to redress a wrong; rather, it is an equitable

proceeding to allow landlocked property owners to acquire access to their property over another's property. *Nice,* 149 Or App at 670 ("A petition for a way of necessity is not by its nature an adversary action."); *id.* at 672 ("[A] statutory way of necessity * * * has been described as analogous to eminent domain proceedings, because a way of necessity is open to the public and can be vacated only with the consent of the county in which it is located." (Citations omitted.)).

We conclude that the court's imposition of attorney fees and costs, required by ORS 376.175(2)(e), does not violate the Justice Without Purchase Clause because it does not fall within the protection of that constitutional provision. Assuming, without deciding, that a way-of-necessity proceeding falls within the term "justice" in the Justice Without Purchase Clause, the payment of reasonable attorney fees and costs by the petitioner, regardless of the outcome, is not a "purchase" within the meaning of that constitutional provision. *See Bailey v. Frush,* 5 Or 136, 138 (1873) ("purchase" in Article I, section 10, refers to buying justice, as with bribes, or to exorbitant costs and disbursements that virtually close the courthouse doors); *Allen,* 184 Or App at 688 ("purchase" suggests the procurement of legal redress by "bribery and other forms of improper influence" and "judicial imposition of fees and costs in amounts so onerous as to unreasonably limit access to the courts"). Like the appellate filing fee in *Allen,* the payment of attorney fees and costs does not procure a particular result; the court awards the landowner attorney fees and costs without regard to whether the way of necessity has been established. When the legislature enacted ORS 376.175, it expressly provided for "the payment of attorney fees to a party put to the burden of defending against a claim for a way of necessity, regardless of the result." *Pike v. Wyllie,* 103 Or App 30, 33, 795 P2d 1097, *rev den,* 310 Or 791 (1990); *compare* ORS 376.175(2)(e) (awarding attorney fees and costs to any landowner whose property "was *subject to the petitioner's action*" (emphasis added)), *with* ORS 376.175(2)(f) (establishing the amount of compensation due to "any owner of land across which any *way of necessity has been established*" (emphasis added)). In striking the balance between allowing a petitioner to acquire road access through a way-of-necessity

proceeding and the concomitant burden on affected land-owners, the legislature has required that the petitioner make landowners whole whose property is subjected to that action. *See Brookshire v. Johnson*, 274 Or 19, 23, 544 P2d 164 (1976) ("The general constitutional and statutory theme in such cases is to make a landowner whole when his property is taken for a public purpose. * * * The same considerations are applicable to [a way-of-necessity action]."); *Hewitt*, 253 Or at 671 (the purpose of the attorney-fee provision in eminent domain proceedings is "to provide substantial equality to landowners").

Nor can we say that, in all circumstances, an award of attorney fees and costs is "so onerous as to unreasonably limit access to the courts." Unlike exorbitant filing fees, the amount of an attorney-fee award varies depending on the nature of the parties' disputes and is not determined until the end of the proceeding. For that reason, the attorney-fee provision cannot, in all cases, constitute an unreasonable bar to access the court. Accordingly, ORS 376.175(2)(e) does not facially violate the Justice Without Purchase Clause.

In the alternative, plaintiffs argue that, as applied in this case, the circuit court's award of $45,698.12 in attorney fees and costs was effectively a "litigation penalty" for exercising their right to seek a way of necessity. For the same reasons that we reject plaintiffs' facial challenge, we also reject their as-applied challenge. In addition, because plaintiffs were the "losing party" in the way-of-necessity proceeding against ODF, we cannot say that the court's attorney-fee award acted as a "litigation penalty" in the manner that plaintiffs describe as unconstitutional, *i.e.*, the "winner pays" feature of the statute. Thus, we conclude that ORS 376.175(2)(e), either facially or as applied, does not violate the Justice Without Purchase Clause of Article I, section 10, of the Oregon Constitution and affirm the circuit court's award of attorney fees and costs of $45,698.12.

In sum, we conclude as follows: ODF did not arbitrarily and capriciously withhold consent because ODF had reasonable concerns about the adverse impact of plaintiffs' proposed way of necessity on marbled murrelet habitat and those concerns were supported by evidence in the

record; FWS's November 2009 letter is not a waiver of more restricted state action by ODF because it is neither an incidental take permit nor an incidental take statement, as required by ORS 496.172(4); the circuit court did not err in giving "not much weight" to FWS's November 2009 letter; and the circuit court's award of attorney fees and costs in this case did not violate the Justice Without Purchase Clause of Article I, section 10, of the Oregon Constitution.

Affirmed.