246 P.3d 39 (2010)
240 Or. App. 201
Joe PETROFF, Petitioner-Respondent,
v.
John E. WILLIAMS and
Laurie A. Williams, Respondents-Appellants, and
Martin Underhill, Respondent.
0600298CC; A138880.
Court of Appeals of Oregon.
Argued and Submitted April 9, 2010.
Decided December 29, 2010.
*40 Laura N. Althouse, Portland, argued the cause for appellants. With her on the briefs were Dunn Carney Allen Higgins & Tongue LLP and Brian R. Talcott.
James M. Habberstad, The Dalles, argued the cause for respondent. With him on the brief was Shannon L. Tissot.
Before SCHUMAN, Presiding Judge, and WOLLHEIM, Judge, and ROSENBLUM, Judge.
ROSENBLUM, J.
In this action for a way of necessity, a corporation wholly owned by petitioner owned two adjoining parcels of property. Petitioner caused the corporation to sell one of the parcels to him without an easement for access, leaving it landlocked. Petitioner then filed in the trial court a petition for a way of necessity across respondent's property. The route he proposed follows an existing dirt track that can be traversed only in a four-wheel-drive vehicle and is impassable after heavy rains. The proposed route also crosses an area that has been identified as an archaeological site and, pursuant to a restrictive covenant mandated by law, may not be disturbed, including by grading of the road, unless an extensive evaluation of its cultural significance is conducted and reveals that the site either is not significant or can be protected by mitigation. The trial court granted the way of necessity but provided in the judgment that no ground disturbance may occur on it unless petitioner complies with the requirements of the covenant. Respondents appeal, arguing that petitioner's property is not truly landlocked and, if it is, petitioner is not entitled to a way of necessity because he created his own lack of access. They also argue that the way of necessity granted by the trial court is not practicable, because it cannot be kept passable without grading work that is presently prohibited by the covenant. On de novo review,[1] we conclude that the property is landlocked and that petitioner is not barred from seeking a way of necessity. However, we conclude that petitioner failed to prove that the proposed point of connection for the way of necessity is practicable. Accordingly, we reverse.
The material facts are largely undisputed. The properties at issue are large parcels on hilly terrain in rural Wasco County near the confluence of the Deschutes and Columbia rivers. In 1977, petitioner began leasing property owned by the Petroff Family Trust, which evidently is controlled by members of *41 petitioner's family. Petitioner used the leased property to grow wheat. Around 1979, petitioner incorporated J.E.P. Wasco, Inc., of which he is the president, secretary, and sole shareholder. He transferred the lease to the corporation. Sometime thereafter, the corporation purchased and began growing wheat on a 160-acre parcel of land known as the Fulton property, which is adjacent to and east of the land leased from the Petroff Family Trust. A parcel owned by Martin Underhill lies to the south of the Fulton property. In 1996 or 1997, J.E.P. Wasco began leasing and growing wheat on a 480-acre parcel, known as the Carlisle property, which lies to the north and east of the Fulton property. In 2001, J.E.P. Wasco purchased the Carlisle property for $199,000.
Fulton Road, a public road, crosses Underhill's property. A graded dirt road runs northwest from Fulton Road on Underhill's property and crosses onto the Petroff Family Trust property, where it runs north along the boundary with the Fulton property (though it does not touch the Fulton property). It eventually turns to the east and onto the Carlisle property. Thus, the Carlisle property can be reached from Fulton Road by driving 1.7 miles on the dirt road, which, for purposes of this litigation, is referred to as the "southerly route." However, there is no recorded easement granting the Carlisle property use of the road. Petitioner used the part of the southerly route on the Petroff Family Trust property to haul out the wheat harvested from the Carlisle property, but he reached a public road by driving across a field on the trust property rather than driving across the Underhill property.
According to petitioner, the former owner of the Carlisle property accessed it primarily via the "northern route," a steep, deeply rutted, half-mile-long dirt track that runs across the property to the north, where it connects with Moody Road. That point on Moody Road is approximately half a mile from the Deschutes River and less than a mile from the Columbia River. At the time, respondent John Williams's parents owned the property on which the dirt track lies.
Petitioner's intent when J.E.P. Wasco acquired the Carlisle property was for the corporation to improve the property and market it for a profit as a home site. Several years after buying the property, J.E.P. Wasco listed it for sale for $1.2 million.
In 2005, Williams's parents partitioned their property and sold the portion of it with the dirt track to respondents. Before they could partition the land, which lies in the Columbia River Gorge National Scenic Area, Williams's parents were required by the Wasco County National Scenic Area Land Use and Development Ordinance (NSA-LUDO) to have a "cultural resources reconnaissance survey" conducted on their property. The archaeologist who performed the survey found three sites with potential historical significance. Because of those discoveries, as a condition of allowing the partition, the NSA-LUDO required that a restrictive covenant be placed on the property to protect the three sites and buffer zones surrounding them. More than half of the dirt track lies within one of those buffer zones.
The covenant does not prohibit use of the dirt track for vehicle access. However, under the covenant, no "ground disturbance" can occur within the buffer zones unless an evaluation of the significance of the sites is conducted by a qualified archaeologist. NSA-LUDO § 14.500(C)(4)(c)(3)(e). We need not belabor the details of that evaluation; it suffices to say that the Wasco County surveyor, Daniel Boldt, testified in the trial court that the process is "daunting." If the archaeologist conducting the survey concludes that sites contain significant cultural resources, an assessment must be performed to determine whether a proposed use of the property will have an adverse effect on the cultural resources. NSA-LUDO § 14.500(E)(1). If an adverse effect is identified, a mitigation plan must be prepared. NSA-LUDO § 14.500(E)(3)(c). Mitigation plans are allowed only if they eliminate the adverse effect; otherwise, the proposed use is not permitted. NSA-LUDO § 14.500(F)(1). The covenant and the ordinance give Wasco County authority to determine whether a use is permitted, but participation by other governmental authorities, including the State Historic Preservation Office and Indian tribal governments, is required. *42 E.g., NSA-LUDO §§ 14.500(D)(2)(d), (3)-(5). An associate planner for Wasco County told Boldt in an e-mail that, if the sites on respondents' property are determined to be significant, "it is very unlikely that disturbance to the existing road would be allowed."
In 2006, respondents brought a quiet title action against J.E.P. Wasco to prevent it from using the northern route. The corporation claimed, as a defense, that it held a prescriptive easement over the property. The court rejected the prescriptive easement claim and ruled in respondents' favor. The next day, petitioner caused J.E.P. Wasco to convey the Carlisle property to him in his personal capacity. The deed stated that the property was sold for $169,000 consideration, but no money actually changed hands, and, at trial in the present case, petitioner could not remember whether he had signed a promissory note in exchange for the property. J.E.P. Wasco did not report the sale of the property on its tax return for that year, though petitioner testified that he had subsequently directed his accountant to amend both the corporate tax return and his personal tax return to reflect the sale. He also testified that the debt for the property was "on the books" of the corporation.
The deed to the Carlisle property expressly provides that "there is no access granted over grantor's adjacent property" and that the conveyed property "has no access to a public way." After the property was conveyed, petitioner filed the petition for the way of necessity at issue in this case. The petition identified the northern route, across respondents' property to Moody Road, as the proposed way of necessity.
Pursuant to ORS 376.200(5), the court appointed Boldt to investigate the proposed way of necessity and to submit a written report. In the report, Boldt described the lower half of the route as "only ten feet wide, in steep terrain, heavily washed out, and accessible only by 4-wheel-drive." He included in the report photos he took showing deep ruts in the dirt track. He stated that, to be usable, the track would require grading, which constitutes a "ground disturbance" under the restrictive covenant. He also noted that the route "may be difficult for trucking grain" because, just beyond the property line, on petitioner's land, a pond has been constructed, and the route "actually climbs the downhill face of the dike * * *." In the report's conclusion, Boldt stated, "Apart from the `no ground disturbance' issue, the Proposed route appears to meet the requirements [for establishing a way of necessity]." He stated that the proposed route is reasonable because of its proximity to Moody Road. He added, "However, the `no ground disturbance' restriction forbids the grading, ditching, and other ordinary road maintenance activities along the washed out portion [of the route]. Until such time, if ever, the cultural resources along the road are determined to be `not significant' by archeologists[,] the route is not useable."
A trial on the way of necessity petition was held on October 18, 2007. Petitioner testified at the trial that he believed that access from the northern route was needed to make the Carlisle property appealing as a home site and that its value was "a lot less" without that access. He candidly stated that he had purchased the property from J.E.P. Wasco because "the value of the ground without that access is of a lot less value to J.E.P. Wasco, and if I buy it from the corporation, I then have a right to go for the access that we're trying to get at this point. And I'm trying to increase the value of the ground."
Petitioner also testified that, although he had previously accessed the Carlisle property via the portion of the southerly route on the Petroff Family Trust property, he had lost the lease on the trust property a month before trial and, because of a breakdown in relations among the Petroff family members, he doubted that he could get permission to continue driving across that land.
Boldt testified at trial about the condition of the access to the property. He testified that he had driven his four-wheel-drive vehicle across the northern route, and stated, "It's not much of a road in its current state now, but I was able to drive it." On cross-examination, respondents' counsel observed that it had been "raining pretty hard" that morning and asked whether Boldt thought his vehicle would make it up the northern *43 route that morning. He answered, "I wouldn't take it up this morning."
After further testimony from Boldt concerning the condition of the two routes to the Carlisle property, respondents' counsel asked the trial court to view the road personally before rendering a decision. The court asked, "Well, is there going to be a time considering the weather conditions this winter that will permit this Court to view that property safely?" The court and the three lawyers present all agreed that it was doubtful that even a four-wheel-drive vehicle could negotiate the northern route in the conditions then present. The court continued the trial to December 7, 2007, and, in the interim, did view the property.
When the trial continued, the court heard arguments from the parties. Respondents argued that the Carlisle property is not, in fact, landlocked, because petitioner could still access it via the Fulton property. They also argued that, if the Carlisle property is landlocked, petitioner knowingly landlocked it and, as such, was barred by ORS 376.180(12) from obtaining a way of necessity.[2] Finally, respondents noted that the governing statutes require that a way of necessity be located on the nearest "practicable" point for connection to a public road. They argued that the northern route is not practicable because it is not usable in its existing state and it is unknown whether the grading and other work that would be needed to make it usable can ever be done.
In the course of hearing the parties' arguments, the trial court made several observations, based on having viewed the property, pertaining to the usability of the northern route. It stated that petitioner would not be able to sell the Carlisle property for residential development "saying, `Well, here's yourhere's your access. There's a ditch running up to this property.'" It also commented on the potential damage that driving on the route in its present condition could cause. Later, when respondents' counsel mentioned that Boldt's report cautioned that "trucking grain out through the northerly route may be difficult," the court responded, "You might be able to truck it out. I don't know if you can get the truck back in there again." The court commented on the trucking issue again later, stating that a way of necessity on the northern route
"is of really not much use except to go up and look at the property. I mean, I don't know how many wheat trucks you're going to bringyou're not going to bring any wheat trucks unlessthe way I see itup that hill. You might get onelike I say, you can get it down, but you're not going to bring them up there. So I don't know what purpose this easement would have if you can'tif you can't use it for developing a building site up there."[3]
Ultimately, the court ruled that the Carlisle property was landlocked and that ORS 376.180(12) did not bar petitioner from obtaining a way of necessity. Despite its reservations about the utility of the northern route, it entered a judgment establishing a way of necessity for agricultural purposes over that route. The judgment expressly provides, however, that any work on the way of necessity is subject to satisfaction of the requirements in the restrictive covenant:
"[N]o ground disturbance, as defined by the covenant * * *, shall occur upon the way of necessity hereby granted unless or until petitioner, or his successors in interest, have complied with the requirements set forth in the covenant. Petitioner, or his successors in interest, have five (5) years from the date of entry of this judgment to comply with the requirements of the covenant. If petitioner, or his successors in interest, do not succeed in complying with the terms of the covenant, or if the evaluations conducted pursuant to the covenant result in an inability to disturb the ground, the way of necessity shall continue *44 in favor of petitioner, or his successors in interest, but access shall be limited to the presently existing conditions, which consist of a rutted track. If the covenant restrictions can be resolved, the road should be graded and a rock surface should be applied."
On appeal, respondents renew the arguments that (1) the property is not landlocked; (2) if it is, petitioner is not entitled to a way of necessity because he knowingly created the landlocked parcel himself; and (3) the northern route is not practicable.
Ways of necessity are governed by ORS 376.150 to 376.200. A "way of necessity," as pertinent here, is a "road established under ORS 376.150 to 376.200 to provide motor vehicle access from a public road to land that would otherwise have no motor vehicle access[.]" ORS 376.150(2)(a). To establish a way of necessity, a landowner must file a petition that contains information including the location of the property to be served by the way of necessity, the location of all public roads in the vicinity, a specific proposed location for the proposed way of necessity, evidence showing the necessity for the establishment of a way of necessity, and evidence that the "specific location proposed for the way of necessity is the nearest practicable point for connection to a way of necessity to a public road." ORS 376.155(2).
Respondents' contention that the property is not landlocked requires little discussion. Respondents argue that petitioner was able to access the Carlisle property through the corporately held landthat is, the Fulton property. The record does not support that assertion. First, the southerly routethe dirt road that reaches Fulton Roaddoes not cross the Fulton property. Second, even assuming that petitioner could cross the Fulton property by another route either by driving across the fields or by creating a new roadhe would still have to take the dirt road across the Underhill property or drive across the fields on the Petroff Family Trust land. Petitioner does not have an easement to cross either of those properties. Nor is there any indication that he is legally entitled to such an easement. In short, the Carlisle property does not have legal access to Fulton Road and is, therefore, landlocked.[4]
We turn to respondents' argument that petitioner knowingly created his own lack of access to public roads. Respondents rely on ORS 376.180(12), which provides that a way of necessity shall not be established "for any land if the owner of the land had knowingly eliminated access to all public roads from the land by the sale of other land owned by the landowner." Respondents argue that, although petitioner "orchestrated his land sale in a thinly-veiled effort to avoid the requirements of ORS 376.180(12), his conduct is of the type the Oregon Legislature sought to prohibit." In respondents' view, the sale of the Carlisle property by J.E.P. Wasco to petitioner was a sham transaction, and they argue that we should ignore the distinction between petitioner and the corporation for the purpose of determining whether petitioner met the statutory requirements. Petitioner responds that the circumstances necessary to pierce the corporate veil are not present in this case.
The parties argue at some length about the propriety of piercing the corporate veil, but neither directly confronts the wording of ORS 376.180(12). In our view, the statute is unambiguous and readily disposes of respondents' argument that petitioner is barred from establishing a way of necessity. It expressly prohibits establishing a way of necessity when a landlocked parcel was created "by the sale of other land owned by the landowner." ORS 376.180(12) (emphasis added). It is undisputed that the Carlisle property became landlocked when that property itself was sold. Whatever the merits of respondents' argument that petitioner's conduct was "of the type" that the legislature sought to prohibit, the statute does not prohibit what petitioner did. Piercing the corporate veil would not change that fact. We *45 reject respondents' position without further discussion.
We turn finally to respondents' argument that the way of necessity established by the trial court is not practicable. ORS 376.155(2)(g) requires the petitioner for a way of necessity to establish that "the specific location proposed for the way of necessity is the nearest practicable point for connection to a way of necessity to a public road." Respondents argue that the northern route is not practicable, contending that it is not usable in its current state and that, because of the restrictive covenant, no work can be done to improve it. In response, petitioner does not contend that the northern route is usable in its present condition. Rather, he argues that it is practicable because it can be made usable, assuming he is able to satisfy the conditions of the restrictive covenant.[5] He contends that the covenant does not render the route impracticable, because it does not permanently prevent ground disturbance. In his view, it is speculative that he will not be able to satisfy those conditions.
We agree with respondents. As the proponent of the proposed way of necessity, petitioner bears the burden of proving the existence of the statutory prerequisites for establishing a way of necessity. Again, ORS 376.155(2)(g) requires the petitioner to include in the petition "[e]vidence that the specific location proposed for the way of necessity is the nearest practicable point for connection to a way of necessity to a public road." Under that provision, the petitioner must show two things: (1) that the proposed point of connection to the way of necessity is "practicable" and (2) that, of all the practicable points for connection on the landlocked property, the point proposed is nearest to a public road. In this case, no one disputes that the point at which the northern route begins is the closest point on petitioner's property to a public road. Thus, the question before us is whether that point is practicable.
The statutes governing ways of necessity do not define the term "practicable." The common meaning of "practicable" is "capable of being put into practice, done, or accomplished: feasible." Webster's Third New Int'l Dictionary 1780 (unabridged ed. 2002). Several provisions in the statutes governing ways of necessity offer additional clues as to what the term means. We examine those provisions in turn.
ORS 376.150(2)(a) defines "way of necessity" as a "road established under ORS 376.150 to 376.200 to provide motor vehicle access from a public road to land that would otherwise have no motor vehicle access[.]" That provision indicates that, to be practicable, the point of connection must be in a location where a road for motor vehicle access can be established.
ORS 376.180(4) provides that a way of necessity shall be "established only for uses in connection with the property for which the way of necessity is sought." On its face, that provision seems only to prohibit establishment of a way in excess of what is needed for the uses to which the benefited property is (or will be) put. However, by providing that a way of necessity shall be established "only" for such uses, it appears to contemplate establishment of a way of necessity that is suitable for those usesthat is, that a court or county governing body may not establish a way of necessity that will not enable the intended uses of the benefited property. Thus, ORS 376.180(4) indicates that a point of connection is not practicable if a way of necessity established from that point would not serve the intended uses of the benefited property.
Finally, ORS 376.190(1) provides that, once established, a way of necessity "shall be maintained and kept passable" by the person owning the benefited property, at least to the extent necessary for the uses to which the benefited property is put.[6] That provision indicates that, to be practicable, the point of *46 connection must be located such that the route to the public road can be maintained and kept passable.
Read together, those statutes indicate that a proposed point of connection is not practicable if the way of necessity established therefrom could not be maintained sufficiently to allow motor vehicle access consistent with the intended uses of the benefited property. In this case, petitioner's property is presently used for agricultural purposes, and petitioner's goal is to develop it for residential purposes (or to sell it for that purpose). The evidence in the record shows that the proposed route is essentially unusable for those purposes in its present condition. It does not provide the access needed for its present agricultural purposes, given that wheat trucks cannot negotiate that route.[7] For residential purposes, the route is, at best, usable only part of the year, and then only by four-wheel-drive vehicles. As the trial court observed, petitioner would not be able to sell the property for residential purposes with an access road that consists of "a ditch running up to th[e] property."
On this record, it is entirely speculative that petitioner will be able to satisfy the covenant conditions necessary to improve the route. Given that the route in its present state is unsuitable for the intended uses of petitioner's property and that it is uncertain whether it can ever be improved, at this point, it is simply unknown whether the proposed point of connection will ever be practicable. It follows that the trial court erred in granting the way of necessity.
Reversed.
NOTES
[1] A 2009 amendment to ORS 19.415(3) made de novo review in most equity cases discretionary. See Or. Laws 2009, ch. 231, § 2. Because the notice of appeal in this case was filed before the effective date of the amendment, we apply the 2007 version, under which de novo review is required.
[2] ORS 376.180(12) provides that a way of necessity shall not be established "for any land if the owner of the land had knowingly eliminated access to all public roads from the land by the sale of other land owned by the landowner."
[3] Although it is not entirely clear from the record, in stating that wheat trucks could not be brought "up that hill," the trial court may have been referring to the face of the dike where the pond was constructed, which is on petitioner's property.
[4] It appears that, as of the time of trial, the Fulton property is also landlocked. That has not been raised as an issue in this case.
[5] At the time of trial, no effort had been undertaken to begin the process required to evaluate the cultural significance of the sites covered by the restrictive covenant.
[6] ORS 376.190(1) expressly provides that the maintenance requirement "does not require the person to provide for maintenance of the way of necessity for uses or persons not specifically provided in the order establishing the way of necessity."
[7] Again, in stating that wheat trucks could not be brought "up that hill," the trial court may have been referring to the face of the dike on petitioner's property. Although the ultimate question in this case is whether the point of connection is practicable, we must consider obstacles on both sides of that point that would preclude the intended use of the benefited property, not simply obstacles in the route between the connection point and the public road.