Argued and submitted March 1, affirmed September 27, 2023

THOMAS CREEK LUMBER AND LOG CO.,
an Oregon corporation,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
Oregon Department of Forestry,
*Defendant-Respondent.*

Marion County Circuit Court
15CV32928; A167397

537 P3d 615

Plaintiff appeals from a judgment denying its petition for a statutory way of necessity over state-owned land. Plaintiff assigns error to the trial court's determination that plaintiff had not met its burden of establishing the requirements for a way of necessity and that the state did not unreasonably withhold its consent to the petition. Plaintiff also asserts that the trial court abused its discretion by awarding an unreasonable attorney fee to the state. *Held*: The Court of Appeals declined plaintiff's request to exercise *de novo* review and concluded that the trial court did not err in concluding that the state did not unreasonably withhold consent to plaintiff's petition. Evidence in the record regarding the state's concerns about long-term maintenance and erosion, in addition to the state's mandate to manage state lands for the benefit of all Oregonians, supported the trial court's conclusion that the state did not act arbitrarily and capriciously. The court also concluded that the trial court did not abuse its discretion in determining the amount of attorney fees to award.

Affirmed.

Audrey J. Broyles, Judge.

Michael T. Stone argued the cause for appellant. Also on the opening brief was Brisbee & Stockton LLC. Also on the reply brief were Brisbee & Stockton LLC and Hood Stone Stockton.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Pagán, Judge, and DeVore, Senior Judge.

SHORR, P. J.

Affirmed.

DeVore, S. J., concurring in part, dissenting in part.

**SHORR, P. J.**

Plaintiff appeals from a judgment denying its petition for a statutory way of necessity over state-owned land and awarding defendant Oregon Department of Forestry $45,094.30 in attorney fees.[1] Plaintiff is the owner of a 160-acre parcel of timber land in Marion County. The parcel is bordered on three sides by federal land, and to the east by defendant's state forestlands. In 1999, plaintiff was issued a six-month special use permit for a road through defendant's land in order to access the parcel for harvesting timber; however, the road was decommissioned by defendant in 2006. In 2015, plaintiff filed a petition pursuant to ORS 376.155 to establish a way of necessity, due to being landlocked. Following a two-day hearing, the trial court found that plaintiff had not met its burden of establishing the requirements for a way of necessity and concluded that defendant did not unreasonably withhold its consent to the petition. On appeal, plaintiff challenges both of those determinations. Plaintiff additionally argues that the trial court abused its discretion by awarding an unreasonable attorney fee to defendant. For the reasons explained below, we conclude that the trial court did not err and we affirm.

*Standard of review.* Plaintiff urges us to exercise *de novo* review pursuant to ORS 19.415(3).[2] Plaintiff asserts that this is an equitable action and that it qualifies as an "exceptional case" under ORAP 5.40(8) because of the important public policy issues at stake and the trial court's findings not comporting with uncontroverted evidence in the record, and argues that the denial of *de novo* review would violate the privileges and immunities clause of the Oregon Constitution. Assuming, without deciding, that a petition

---

[1] The statute at issue contemplates a "petitioner" rather than a "plaintiff." However, we refer to the parties consistent with the caption to this case.

[2] ORS 19.415(3) states:

"Upon an appeal in an equitable action or proceeding, review by the Court of Appeals shall be as follows:

"* * * * *

"(b) Upon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."

for a way of necessity is an equitable case in which we have discretion to exercise *de novo* review, we decline to do so.

Plaintiff asserts that the trial court's decision is contrary to public policy, particularly the priority of full utilization of land and the disfavoring of landlocked parcels, thus justifying *de novo* review. Without commenting on the prioritization of various competing policy issues, we note that plaintiff's argument would arguably result in all denials of petitions for a way of necessity being reviewed *de novo*. We decline to create such an additional sweeping category of cases subject to *de novo* review. Specific to this case, and as discussed further below, we do not agree with plaintiff that the trial court's decision fails to comport with the uncontroverted evidence in the record, as was the situation in the cases cited by plaintiff in its reply brief. *See Dept. of Human Services v. M. E.*, 255 Or App 296, 299, 307-08, 297 P3d 17 (2013) (exercising *de novo* review in a dependency case when the trial court mischaracterized an expert's testimony about the threat a father posed to his biological children versus his stepchildren when the expert had actually stated that the father did not present a risk to any of the children); *State v. S. N. R.*, 260 Or App 728, 733-34, 320 P3d 569 (2014) (exercising *de novo* review when the transcription of the adjudicated youth's statement "contained a significant error on which the juvenile court relied to support its decision to take jurisdiction"). No such striking error is present in the matter before us.

We further reject plaintiff's argument regarding the privileges and immunities clause. ORS 376.155 contemplates a petition for a way of necessity being filed with the relevant county's governing body; however, ORS 376.200 allows a county governing body to remove itself from jurisdiction, thus vesting jurisdiction in the circuit court for the county. Marion County has adopted such an ordinance. Marion County Code 11.60.020. Plaintiff asserts that, absent such an ordinance, a petition for a way of necessity is initially heard and adjudicated by the county's governing body and is then subject to intermediate *de novo* review by the circuit court. By the county transferring jurisdiction to the circuit court, plaintiff asserts that petitioners in Marion County

are deprived of an intermediate *de novo* review, and thus are treated disparately from petitioners in counties which have not transferred jurisdiction, in violation of the privileges and immunities clause of the Oregon Constitution.[3] Plaintiff urges us to take *de novo* review to avoid such disparate treatment.

We decline to do so. Plaintiff has not identified a "class of citizens" within the meaning of Article I, section 20, that has been disparately impacted. Classifications that are created by the statute challenged are not entitled to special protection. *State ex rel Huddleston v. Sawyer*, 324 Or 597, 610, 932 P2d 1145, *cert den*, 522 US 994 (1997); *see also Barrett v. Williams*, 247 Or App 309, 314-15, 270 P3d 285 (2011), *rev den*, 352 Or 25 (2012) ("'Inmates' are not a true class in this instance for purposes of Article I, section 20, that is, a group that consists of individuals who would be considered as belonging to a distinctive group even if the statute that burdens them did not exist. If the group does not fit that definition, then Article I, section 20, simply does not apply." (Internal citations omitted.)). The class of people consisting of "petitioners for a way of necessity who must file in Marion County" is not a true class. We conclude that plaintiff's lack of access to an earlier preliminary decision by the county governing body does not implicate a violation of the privileges and immunities clause.[4]

---

[3] "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." Or Const, Art I, § 20.

[4] We additionally note that plaintiff's characterization of circuit court proceedings following a county decision as "*de novo* review" is not necessarily consistent with the way that term is used in this court. ORS 376.175(5) provides that "[a]ny party to the action for a way of necessity may contest any part of the order of the county governing body in an appeal filed with the circuit court[.]" Such a proceeding would involve the creation of a record before the circuit court and the circuit court not being bound by the county governing body's factual findings. Contrarily, while *de novo* review before this court allows us to make factual findings anew on the record, the record is established and not subject to further development, and we defer to certain lower court findings, particularly relating to the credibility of witnesses. *Union Cemetery Assn. of Crawfordsville v. Coyer*, 214 Or App 24, 34, 162 P3d 1072, *rev den*, 343 Or 691 (2007). We therefore do not accept plaintiff's premise that an "intermediate *de novo* review" by the circuit court is equivalent to *de novo* review in this court. However, it is not necessary for us to conclusively decide that issue.

Absent *de novo* review, the parties agree that we review the trial court's factual findings for any evidence in the record to support them, and its legal conclusions for errors of law. *Allco Enterprises v. Goldstein Family Living Trust*, 183 Or App 328, 330, 51 P3d 1275 (2002). "In our review of the record, we view the evidence in the light most favorable to the prevailing party, which is entitled to the benefit of every reasonable inference that may be drawn from the evidence." *Coast 2 Coast Logistics v. Badger Auctioneers*, 323 Or App 374, 387, 524 P3d 555 (2022).

*Merits of plaintiff's petition.* A petitioner who seeks a way of necessity bears the burden of proving by a preponderance of the evidence that the twelve conditions for establishing a way of necessity, enumerated in ORS 376.180, have been met. *Bradley v. Dept. of Forestry*, 262 Or App 78, 83, 324 P3d 504, *rev den*, 355 Or 879 (2014). A petitioner who seeks a way of necessity over state-owned land cannot receive access unless the state grants permission. ORS 376.180(11). In turn, ORS 376.185 provides that the state "shall not unreasonably withhold" consent to the petition. We have previously held that the state acts "unreasonably" if it "arbitrarily and capriciously" withholds its consent. *Bradley*, 262 Or App at 94.

The trial court concluded that plaintiff had not met its burden in establishing the statutory requirements, and further concluded that defendant's withholding of consent was not unreasonable.[5] The trial court did not make explicit factual findings in reaching those conclusions. On appeal, plaintiff asserts that those conclusions were not supported by competent evidence and were thus erroneous as a matter of law. It argues that it presented evidence that satisfied each of the twelve requirements of ORS 376.180 and

---

[5] The trial court's letter opinion states: "[T]he court does not find that petitioner has met its burden in establishing the twelve requirements as set forth in ORS 375.155." The parties acknowledge that this is a misstatement, or at minimum a confusing ruling. The 12 criteria are actually contained in ORS 376.180. ORS 376.155 contains a list of information that must be contained in a petition for a way of necessity. The Oregon Revised Statutes do not have a chapter 375. Plaintiff assumes that the court misspoke and intended to reference ORS 376.180. Like the parties, we also presume the court intended to reference the 12 requirements of ORS 376.180. Given our conclusion below, the court's mistaken statement does not affect our analysis.

proved that the state's withholding of consent was unreasonable, and that defendant did not present competent evidence to the contrary. Defendant asserts that plaintiff failed to meet its burden to establish at least four of the requirements. Because it is dispositive, we only address the issue of whether defendant's withholding of consent to plaintiff's petition was unreasonable.

In *Bradley*, we examined the legislative history of ORS 376.185 and concluded that the issue of whether the state unreasonably withheld consent to a way of necessity was a matter of whether the state acted arbitrarily and capriciously in so doing. *Bradley*, 262 Or App at 91-94. The arbitrary and capricious standard is highly deferential to agency action:

> "'The terms "arbitrary and capricious action," when used in a matter like the instant one, must mean willful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case. On the other hand, where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion had been reached.'"

*Id.* at 94 (quoting *Jehovah's Witnesses v. Mullen et al*, 214 Or 281, 296, 330 P2d 5 (1958), *cert den*, 359 US 436 (1959)). A court is not to substitute its own judgment for that of the state agency but must determine if the agency "examined relevant data and articulated a satisfactory explanation for its decision" that includes a rational connection between the facts and the decision. *Id.* at 94-95.

In its answer to plaintiff's petition, defendant asserted a number of reasons for opposing the proposed way of necessity, including detrimental impact to natural resources, unstable soils on the slope causing environmental and safety concerns, interference with the land's greatest permanent value, and detrimental impact on the state's financial interests due to liability concerns. Before the trial court, defendant presented multiple witnesses who testified regarding those various concerns.

Plaintiff asserts that the concerns regarding environmental impact and safety are unfounded based on the

state's willingness to grant plaintiff a new special use permit that would allow a road in the same proposed location. Plaintiff essentially argues that if the road would be allowed under a special use permit, then the environmental and safety concerns must not actually be valid and are being used unreasonably to deny the way of necessity. However, viewing the evidence in the light most favorable to defendant, the state, and drawing reasonable inferences, we conclude that the trial court could reasonably conclude that defendant did not act arbitrarily and capriciously.

The record contains no evidence that defendant did in fact approve a new special use permit for plaintiff to re-establish the road in the same location. Defendant's witnesses indicated that the environmental concerns surrounding watershed and owl habitats would have to be investigated completely before any permits would be issued.

Regardless, the record does contain evidence regarding the state's legitimate concerns about maintenance and erosion in the long term, and the statutory mandate to achieve the greatest permanent value and manage forests for the benefit of all Oregonians. Defendant's witness Loffelmacher testified that current road-building practices favor roads on ridges rather than mid-slope, due to better soil stability and less long-term maintenance. Another witness, Cone, testified that he had concerns about the proposed location for the way of necessity, based on the steepness of the side slopes and the potential for slope failure. There was evidence that the slopes off the side of the road are mostly over 60-percent grade. Although plaintiff would have to maintain the road under ORS 376.190(1) and Walker (the president and majority shareholder of Thomas Creek Lumber) testified that he would seek to ensure long-term maintenance of the road by subsequent owners of his landlocked property, the state, which ultimately would own the road and the area surrounding it, has a legitimate long-term interest in not ultimately taking on the liability for the maintenance and safety of a road built onto the side of a steeply-sloped hill should plaintiff and its successors not maintain the road. *See Bradley*, 262 Or App at 82 (noting that a successful petition for a way of necessity creates public access to landlocked

property over a road "determined, owned, and controlled" by the government). Of course, even if a private business has the legal responsibility to maintain a road, businesses can fail, disappear, or not pay for their liability; it is ultimately the state that owns the road on the steeply sloped hill and the land around it. It is the state that has the ultimate responsibility for its land.

Further, Dent, the Division Chief of state forests for the Oregon Department of Forestry, testified that permanent easements across state land have the potential to affect the value of the state land and commit the state lands to a future use that may or may not align with state mandates for land management. She testified that creating such an easement for the benefit of a private landowner would not create the greatest permanent value for all Oregonians. Based on the record, the trial court could reasonably conclude that defendant articulated a reasoned explanation for withholding consent to the petition, and thus did not act arbitrarily and capriciously as a matter of law.[6]

The dissent views the record differently, offering a reasonable interpretation of the evidence, noting the general nature of the state's concerns and finding them insufficient to constitute a reasonable basis for withholding consent. However, given our standard of review for any evidence to support the trial court's factual determinations, we conclude that the two different reasoned conclusions demonstrate that the state's position was not arbitrary and capricious. As noted above, "where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration[.]" *Bradley*, 262 Or App at 94.[7]

Our conclusion renders a discussion of the remaining twelve requirements under ORS 376.180 unnecessary.

---

[6] Plaintiff asserts that the testimony from Cone, Dent, and another state employee, Cate, does not constitute competent evidence because there is no indication that any of those individuals were involved in the process of deciding whether to consent to the way of necessity, and there is no evidence that any of the concerns expressed by those witnesses were communicated to the individuals who were involved in the decision-making. Plaintiff did not raise any such objections before the trial court. We therefore do not consider those arguments on appeal.

[7] We agree with the dissent that if this was not the standard intended by the legislature, amendment of the way of necessity statutes may be warranted.

*Attorney fees.* Plaintiff additionally assigns error to the court's award of attorney fees to defendant in the amount of $45,094.30. Pursuant to ORS 376.175(2)(e), the petitioner is responsible for "costs and reasonable attorney fees incurred by each owner of land whose land was subject to the petitioner's action for a way of necessity," regardless of the outcome of the petition. We review the trial court's award of attorney fees for an abuse of discretion. ORS 20.075(3). We conclude that the trial court did not abuse its discretion.

Affirmed.

**DeVORE, S. J.,** concurring in part, dissenting in part.

I write separately to offer a different view of the merits concerning whether the state's refusal to consent to the way of necessity was unreasonable.

I concur that plaintiff (Thomas Creek) has not suffered a violation of the Privileges and Immunities Clause of Article I, section 20, of the Oregon Constitution.

I believe that the underlying proceeding was equitable in nature, and I reject the state's argument to the contrary. *See Petroff v. Williams*, 240 Or App 201, 203 n 1, 246 P3d 39 (2010) (treating a statutory way of necessity as an equity case). I believe that this court *could* exercise its discretion to try the cause anew on the record under ORS 19.415(3)(b), because the trial court made no express factual findings, and the presumed findings, which are implicit in its legal conclusions, should be said to be unsupported by the record on a critical point. *See Dept. of Human Services v. B. B.*, 248 Or App 715, 718, 274 P3d 242, *adh'd to on recons*, 250 Or App 566, 281 P3d 653 (2012) (observing that we do exercise discretion to take *de novo* review where the trial court's most important factual findings do not comport with the uncontroverted evidence in the record or are inconsistent with other factual findings); *see also State v. S. N. R.*, 260 Or App 728, 733, 320 P3d 569 (2014) ("We have in prior cases concluded that a case is exceptional, and deserving of *de novo* review, when a crucial finding supporting the lower court's decisions does not comport with the evidence in the record."). Even when we choose *not* to exercise *de novo*

review, we still review for legal error and substantial evidence in the record to support the trial court's conclusions. *M. S. v. Burns*, 245 Or App 35, 36, 261 P3d 54 (2011). When we reach the critical point—whether the state's refusal to grant consent was unreasonably refused—the state's rationale and the trial court's conclusion fail as a matter of law and undisputed fact. The trial court's conclusion fails under *either* approach to review.

As I understand it, the majority opinion does not center on the state's arguments about the impact of the requested way on trees, fish, or owls. The uncontroverted record is that the requested road is already constructed, and no reforestation or replanting has occurred on its course. The dispute involves a section of road 0.6 mile in length, which the state decommissioned by removing two or three culverts and moving some gravel from the outside shoulder of the road to the inside, uphill bank.

The court-appointed expert, Stuntzner Engineering, was chosen by both parties. Its report described the soils as very rocky and explained that erosion in the stream channels had not been a problem, so replacing the culverts would not impact the streams. When engineer Stuntzner inspected the road, he saw that one stream channel had a little water and two channels were dry. Vegetation grew in the middle of the channels, indicating that there is not a lot of storm water running through the channels. The channels are a "small type" and are not themselves fish-bearing; instead, they eventually feed into fish-bearing streams below.

Stuntzner's forester, Barnhart, testified that the requested way is within an "owl circle" but the requested way is further away from the center of the circle than an alternate, unconstructed, access route through old-growth timber. The circles have different areas—core areas and habitat for foraging. He explained that there are seasonal restrictions on how close operations can be to the nesting area. The requested way does not go through a core area. Restoration of the road would allow travel through a previously harvested area of younger timber that is not nesting habitat.

The state's witness, Loffelmacher, testified that, after study, the state was "likely" to grant Thomas Creek a temporary use permit for access to conduct logging, but only a temporary permit.[1] For perspective, I note that a way of necessity affords a permanent right of access to land-locked land. ORS 376.150; ORS 376.175; ORS 376.180; ORS 376.190(2). And, an order for such a way can provide that it be gated to limit its use to those uses for which it is granted, thus preventing general public access. *See* ORS 376.180(2), (4) (allowing for gating and restricting use). Thomas Creek observed that any concern about the passing effect of equipment on an existing roadbed already cut through a half-mile of young timber was little different regardless whether that passing disturbance happens under a temporary permit or a way of necessity. Given the location and past use, it is no surprise that the issue of the reasonableness of the state's refusal does not center on trees, fish, or owls.

For a pair of reasons, the majority concludes that the state's refusal to consent to a way of necessity is not unreasonable. 328 Or App at 315-17. As the majority recognizes, ORS 376.180(11) provides that a way of necessity shall not be established "over land owned by the state or a political subdivision of the state unless permission is granted for the way of necessity under ORS 376.185." In turn, ORS 376.185(1) provides, in relevant part, "The governing body of a political subdivision of this state and any agency of the state shall not unreasonably withhold consent required under this subsection." In essence, refusal cannot be arbitrary or capricious. *Bradley v. Dept. of Forestry*, 262 Or App 78, 94, 324 P3d 504, *rev den*, 355 Or 879 (2014). We have quoted the Supreme Court to explain:

> "'The terms "arbitrary and capricious action" when used in a matter like the instant one, must mean willful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case.'"

*Id.* (*quoting Jehovah's Witnesses v. Mullen et al*, 214 Or 281, 296, 330 P2d 5 (1958), *cert den,* 359 US 436 (1959)).

---

[1] Thomas Creek wants permanent access in order to be assured of its ability to visit for spraying, brush-control, commercial thinning, or, presumably, incremental logging, as it had done before.

The majority first relies on the state's concern for long-term maintenance of the road. Loffelmacher, a forestry supervisor, testified to concern about roads built on mid-slope, rather than along ridges, due to risks of soil instability and long-term maintenance costs. Forest engineer Cone testified that standard practice is to avoid building side-cast ballast roads to avoid the risk of slope failures. The majority acknowledges that Thomas Creek would be required to maintain the road, but concludes that "it is ultimately the state that owns the road * * * and the land around it," so "[i]t is the state that has the ultimate responsibility for its land." 328 Or App at 317. For that first of two reasons, the majority concludes that the state was not unreasonable in refusing consent to the way of necessity.

I respectfully disagree. My reasons are founded on uncontested facts about the state's practical responsibility for the road and undisputed law about the state's legal liability for its maintenance. To begin, a look at the record is necessary. The state's witnesses spoke in broad terms about general road-building practices, but they did not testify to any signs of fractures, subgrade cracking, or slumping on *this* road's slope. Although the decommissioned road has existed since the early 1970s, affording over forty years of history, the state offered no evidence of landslides on this particular slope. Moreover, the state witnesses did not outline a ridgeline-route to the Thomas Creek property that could avoid climbing a mid-slope. The primary alternate route still requires climbing slopes, plus felling mature trees and traveling through the core nesting area of northern spotted owl. A second alternate route would be worse.

The court-appointed engineer Stuntzner testified that he inspected the decommissioned road, its banks, and its slopes. He testified that he did not see any subgrade cracking or slumping. He described the location as stable, concluding that the road is "in a good location." Likewise, his forester Barnhart looked for stability issues, fractures, or evidence of past landslides, below and above the cut slopes. In his report to the court, he concluded that there was no sign of solid-mass movement or landslide problems at the location, and that the "rocky soils appear to be very stable."

Seen together, there was no conflicting evidence. Rather, the state witnesses spoke of sensible but generalized practices without pointing to observed problems at this location, while experts Stuntzner and Barnhart described the specific road as stable. The parties' witnesses did not necessarily disagree; rather, they talked past each other.

Nonetheless, I understand that the majority finds some evidence in the generalities of the state witnesses' testimony to support a concern that this existing road might experience slope problems in the long-term. I do not view the record that way, given what was said, but our difference of opinion does not matter to a proper conclusion in the end. The majority determines that the state's refusal to consent was not unreasonable, because the state is thought to have "ultimate responsibility" for "the land." As a matter of law, of course, the state does not have responsibility for the road. That is because ORS 376.190(1) provides, in relevant part:

> "A way of necessity that is established under ORS 376.150 to 376.200 shall be maintained and kept passable *by the person owning the land for which the way of necessity is established*."

(Emphasis added.) Thomas Creek, and only Thomas Creek, must maintain its way of necessity. The state has no legal liability to maintain the road.

The same is true as a matter of fact when we consider practical "responsibility." In *these* circumstances, the uncontroverted record is that the state did not and does not want this road. The record shows that the state has refused consent to the way of necessity. And earlier, after the road had been used for a timber harvest under a temporary use permit in 1999, the state decommissioned the road and removed culverts so as to make the road impassable. Consequently, *if* the road did fail at some time in the future and if Thomas Creek or its successors did not perform their lawful duty of repair, the practical circumstances *do not* leave the state with a road to repair. In that circumstance, the road would return to the same impassable condition that the state declares that it wants. Any practical responsibility is imaginary; indeed, the state has already demonstrated that it disclaims the road. As a result, there is no legal

liability or practical risk to the state that makes reasonable its refusal to allow Thomas Creek permanent access to its property.

The majority adds a further reason to support its determination. Dent, a division chief in the Department of Forestry, testified, "generally speaking," that "permanent easements" across state lands affect value and "make commitments" to a "future use and practice" that "may or may not align with how [the department is] mandated to manage the land." Dent testified, again generally, that a permanent easement to benefit an adjacent private landowner would not create the greatest permanent value for Oregonians. She did not testify, in general or in particular, *how* closing or reopening the road affected or committed the lands of the state or Thomas Creek contrary to achieving the greatest value for Oregonians.

I believe the state's refusal to consent cannot be found reasonable under the further rationale. As noted at the outset, we review the record for any substantial evidence that is critical to a trial court's conclusion, whether or not reviewing *de novo*. It is no coincidence that, when examining an agency's decision in contested cases, we also review for substantial evidence. ORS 183.482(8)(c) (judicial review of agency decisions). That review necessitates a review for substantial reason. *See WaterWatch of Oregon v. Water Resources Dept.*, 268 Or App 187, 212, 342 P3d 712 (2014) ("As part of our substantial evidence review, we also look at whether the findings provide 'substantial reason' to support the legal conclusion reached by the agency." (Internal quotation marks and brackets omitted.)). "Substantial reason" requires a "reasoned explanation" between the "what" and the "how" in order to "connect the dots" between conclusions and the facts at hand. *Id.* at 222-23; *see also id.* at 212 (Agencies "'are required to demonstrate in their opinions the *reasoning* that leads the agency from the *facts* that it has found to the *conclusions* that it draws from those facts.'" (Quoting *Warkentin v. Employment Dept.*, 245 Or App 128, 134, 261 P3d 72 (2011) (emphasis in *Warkentin*).)). The failure to make that connection means a lack of substantial reason or evidence. *See id.* at 224-25 (reversing and remanding).

The further rationale—that consent is contrary to state goals—fails the standard of substantial reason. Division chief Dent did not testify what in particular was the highest and best use of the of state lands astride the half-mile section of closed road. Nor did she testify exactly *how* closure and refusal to reopen the road served to maximize value for all Oregonians.[2] She did not "connect the dots" between the facts and agency refusal. At best, Dent concurred in the testimony of other state witnesses who similarly spoke in generalities rather than specifics.

The uncontroverted record shows that the purpose of these lands—those of Thomas Creek, neighboring owners, and the state—have already been determined. If we recognize, as Dent suggested, that creating a road can determine the purposes of lands, then we must recognize that the record shows that the Mt. Horeb locale is already served by a network of roads belonging to a county, the U.S. Forest Service, the Bureau of Land Management, Weyerhaeuser, Thomas Creek, and the State of Oregon. Whatever various purposes those roads serve, those roads have already determined the uses of the lands and committed the land to those purposes. Indeed, the sale of 160 acres to a private owner who preceded Thomas Creek already determined the use of that land, while that sale simultaneously determined at least one related purpose—that of the neighboring state land providing access to the Thomas Creek acreage. That purpose was confirmed by the timber harvests on the Thomas Creek acreage in the 1970s and the small harvest around 1999. Together, the network of roads in the area, the sale of land to a private owner, and the half-mile portion of roadbed necessary to reach the private property already decided the multi-use character of these lands. Those undeniable facts preempt any reasonable reliance on a worthy but abstract goal about maximum benefit of state lands for Oregonians—whatever that might mean in another, particular location.

---

[2] Dent did testify that the department had rules on "potential liability exposure on its roads," there is broad public access for multiple uses like recreation, and that public safety was paramount. That abstract testimony, however, did not explain how the state is responsible for this road for which it would not be legally or practically responsible to maintain—particularly when it can be gated against public access and limited to a way of necessity.

In this case, the underlying problem is that the state is changing its mind. The state does so despite the commitment that it should recognize had already happened when land was sold to a private owner and a road was built to provide access to that land. The state changed its mind when it decommissioned a half-mile section of road and land-locked the Thomas Creek acreage. That change makes painful the need for substantial reason to explain why the state *changed* the already established purpose of its short section of land that was committed to providing access to the Thomas Creek acreage. The need for that explanation is inseparable from the mandate that consent shall not be unreasonably refused.

When Walker, the manager and co-owner of Thomas Creek, learned of the road closure around 2006, he called the Oregon Department of Forestry and asked why. Walker testified that "they said they took that road out because there was nobody back there." He suggested that they check their map and files, because "we were indeed back there."

The state's testimony at trial was not more illuminating. When speaking of general goals for land use, division chief Dent did not explain *why* the state had decided to change the land use to which the land was already committed.[3] Dent said, without specifics, that the decision to vacate the road would have gone through a review process as part of an annual operating plan, while Loffelmacher said that she did not know whether anyone consulted about the closure with regard to fish or owls. In short, the state did not explain, in terms of state goals, exactly why it changed its

---

[3] Without speaking in terms of goals, Dent agreed with the concerns of prior state witnesses and testified to two personal concerns. First, she said that the division has a long history of collaborative relationships with private landowners and federal neighbors; and second, that the state is under intense public scrutiny involving environmental concern such as avoiding channeling streams or delivering sediment to fish-bearing streams. Neither concern, I believe, is a reasoned explanation in terms of a change in land-use goals, here. First, landlocking Thomas Creek was not collaborative. Thomas Creek's co-owner, Walker, complained that he had a verbal agreement that the state would leave the road in or at least tell him, if it were to be otherwise. Second, installing just culverts no more channelizes a *stream* than the short, existing, open crossings already do; and no one disputed the expert testimony that these channels were rocky, vegetation grew in the channel beds, and there was no threat to fish-bearing streams below. Dent had not seen the property personally.

mind about a land-use at this location—that is, providing access—to which it had already committed.

Ordinarily, Oregon statutes would afford relief by allowing Thomas Creek a way of necessity.[4] *See* ORS 376.150 to 376.200 (way of necessity provisions). However, that has changed. As recounted in *Bradley*, the early version of the statutes allowed a private owner a way of necessity without state consent and without any consideration of the state's interest. 262 Or App at 92-93 (referring to *former* ORS 376.125, *repealed by* Or Laws 1979, ch 862, § 12). That meant that private owners, who proved the need for a way of necessity, got ones whenever they wanted. *Id*. In reaction, a legislative amendment in 1979 introduced the need for the state's consent, but with the limitation that consent shall not be unreasonably denied. ORS 376.180(11); ORS 376.185(1); Or Laws 1979, ch 862, §§ 6, 7.

Today, the meaning of this case is that the state can decommission an existing road, landlock a neighbor, and leave the neighbor without recourse through a way of necessity, when the state has changed its mind about the commitment to the established use of its land that has provided access. That is, the state may do so, when cloaked in "reasonable refusal," without connecting the dots by specifying which particular goal is served, without explaining how that goal is applied to a particular road and location, and without explaining why it has chosen to change the goals to be served, despite the neighbor's need.[5] If that triple failure

---

[4] Pragmatically, a way of necessity is a poor remedy of last resort, because, win or lose, the petitioner (plaintiff) must pay the other side's legal fees. ORS 376.175(2)(e) (the court must "[d]irect the petitioner to pay costs and reasonable attorney fees incurred by each owner of land whose land was subject to the petitioner's action for a way of necessity under ORS 376.150 to 376.200"); *Brookshire v. Johnson*, 274 Or 19, 23-24, 544 P2d 164 (1976) (landowner subject to way of necessity was entitled to attorney fees); *see also Morgan v. Hart*, 325 Or 348, 355-56, 937 P2d 1024 (1997) (the plaintiff was required to pay attorney fee of land-owners whose land was made subject to action by surveyor's report, even though the plaintiff did not ask for way of necessity across their property and agreed that way of necessity should not be established over that land). Thomas Creek estimated its cost of restoring the road to be $20,000 to $25,000. The state's attorney fees, costs, and disbursement, awarded after trial, are $45,927.30—roughly double the cost of reopening the road. Thomas Creek's added debt owed to the state, for the state's fees on appeal, is yet to be awarded.

[5] The court cannot "fill in the blanks" for an agency based on generalized worries about roads crossing slopes where stability ultimately does not matter,

is to be the result here, then the law, like a pendulum, has swung from one extreme before 1979 to another today. If so, legislative intervention will again be needed—this time to explicitly define the prohibition on unreasonably withholding consent as requiring an explanation that is founded in substantial evidence and substantial reason. That really should not be necessary, because, I believe a proper conclusion should be that there was a failure of substantial reason here. Without substantial reason, there is no substantial evidence on a critical point of fact for decision. Without substantial reason, refusal to consent cannot be a reasonable refusal.

To borrow from *Bradley*, because the state's decision is "willful and unreasoning," is "without consideration," and is "in disregard of the facts and circumstances of the case," it *is* arbitrary and capricious. *Bradley*, 262 Or App at 94. Surely, a refusal to consent is arbitrary and capricious, when it is based on a misunderstanding that the state would be stuck maintaining a road—a road that it is free to allow to fall into disuse, just as the state wishes. Surely, a refusal to consent is arbitrary and capricious, when it relies on an abstract goal—the maximum benefit for all—that is not concretely explained or applied and when contradicted by a record showing uses have already been decided by sale of private land and construction of a roadbed. Surely, reversing committed uses without a cogent explanation is arbitrary and capricious.

The statutory term "unreasonably withhold" must have some enforceable meaning. If that term is not enforced in this case, then the legislature's term, plainly expressed in ORS 376.185(1), is meaningless. Assuming that the term should have meaning, I conclude that the state unreasonably withheld consent and that the trial court erred in concluding otherwise. Therefore, on the merits, I respectfully dissent.

---

because the state has no legal liability to maintain the road and the state has no interest in repairing the road if the slope fails.